# REGAN, SECRETARY OF THE TREASURY, ET AL. *v.* WALD ET AL.

No. 83–436.   Argued April 24, 1984—Decided June 28, 1984

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, STEVENS, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and POWELL,

224

*Deputy Solicitor General Bator* argued the cause for petitioners. With him on the briefs were *Solicitor General Lee, Acting Assistant Attorney General Willard, Carolyn F. Corwin, Michael F. Hertz,* and *Davis R. Robinson.*

*Leonard B. Boudin* argued the cause for respondents. With him on the brief were *Eric Lieberman, Charles S. Sims, Burt Neuborne, Michael Ratner, Jules Lobel,* and *Harold A. Mayerson.*\*

JUSTICE REHNQUIST delivered the opinion of the Court.

Respondents are American citizens who want to travel to Cuba. They are inhibited from doing so by a Treasury Department regulation, first promulgated in 1963, which prohibits any transaction involving property in which Cuba, or any national thereof, has "any interest of any nature whatsoever, direct or indirect." 31 CFR § 515.201(b) (1983) (Regulation 201(b)). For a period of about five years, "transactions ordinarily incident to" travel to and from as well as within Cuba were, with some limitations, exempted from the broad prohibition of Regulation 201(b) by a general license. See 31 CFR § 515.560 (1983). But this general license was amended in 1982, and the scope of permissible economic transactions in connection with travel to Cuba was significantly narrowed. 47 Fed. Reg. 17030 (1982).

Respondents challenged the amendment to the general license on constitutional and statutory grounds and sought a preliminary injunction against its enforcement. The District Court for the District of Massachusetts concluded that respondents had not demonstrated a substantial likelihood of

---

\**Michael E. Deutsch* filed a brief for the Chicago Council of Lawyers as *amicus curiae* urging affirmance.

*Herbert Semmel* filed a brief for the United National Council of Churches of Christ in the United States et al. as *amici curiae.*

success on the merits and refused to issue the injunction. App. to Pet. for Cert. 22a. On appeal taken by respondents, the Court of Appeals for the First Circuit, concluding that the challenged amendment lacked statutory authority, vacated the District Court's order and remanded with instructions to issue the preliminary injunction. 708 F. 2d 794 (1983). We granted the Government's application for a stay of the mandate, 463 U. S. 1223 (1983), as well as the petition for certiorari, 464 U. S. 990 (1983), and now reverse the judgment of the Court of Appeals.

I

Regulation 201(b) was promulgated in 1963 as part of the Cuban Assets Control Regulations, 31 CFR pt. 515 (1963), implemented under the Trading With the Enemy Act of 1917 (TWEA), 40 Stat. 411, as amended, 50 U. S. C. App. § 1 *et seq.* See 28 Fed. Reg. 6974 (1963).[1] At that time, § 5(b) of TWEA gave the President broad authority to impose comprehensive embargoes on foreign countries as one means of

---

[1] Alternative statutory authority for the Cuban Assets Control Regulations was found in the Foreign Assistance Act of 1961, Pub. L. 87–195, 75 Stat. 424. See 28 Fed. Reg. 6974 (1963). Section 620(a) of that Act, which is still in force, provides:

"No assistance shall be furnished under this chapter to the present government of Cuba. As an additional means of implementing and carrying into effect the policy of the preceding sentence, the President is authorized to establish and maintain a total embargo upon all trade between the United States and Cuba." 22 U. S. C. § 2370(a).

The Government has chosen not to rely on § 620(a) of the Foreign Assistance Act as statutory authority for the 1982 limitations on permissible travel-related economic transactions, apparently for two reasons. See Brief for Petitioners 4, n. 8. First, the scope of § 5(b) of TWEA, see n. 2, *infra*, appears to be broader than that of § 620(a) insofar as it reaches financial transactions unrelated to trade. Second, the Foreign Assistance Act does not provide criminal penalties for violations of the regulations promulgated under it. TWEA does so provide. See 50 U. S. C. App. § 16.

dealing with both peacetime emergencies and times of war.[2] The Cuban Assets Control Regulations constitute such an embargo.[3] They were originally adopted to deal with the peacetime emergency created by Cuban attempts to destabilize governments throughout Latin America. See Presidential Proclamation No. 3447, 3 CFR 157 (1959–1963 Comp.).[4]

---

[2] In 1963, § 5(b) of TWEA provided in relevant part:

"(1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

"(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and

"(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . ." 50 U. S. C. App. § 5(b) (1958 ed.).

TWEA was first passed in 1917, six months after the United States entered World War I. See Act of Oct. 6, 1917, ch. 106, 40 Stat. 411. As originally enacted, TWEA dealt only with the President's use of economic powers in times of war. The Act was expanded to deal with peacetime national emergencies in 1933. Act of Mar. 9, 1933, ch. 1, 48 Stat. 1. The President has delegated his authority under TWEA to the Secretary of the Treasury, Exec. Order No. 9193, 3 CFR 1174, 1175 (1942), who in turn has delegated that authority to the Office of Foreign Assets Control, Treasury Department Order No. 128 (Rev. 1, Oct. 15, 1962).

[3] Similar embargoes are in place against North Korea, Vietnam, and Cambodia. See 31 CFR pt. 500 (1983).

[4] The Cuban Assets Control Regulations incorporated and expanded upon prior economic sanctions imposed on Cuba. See, e. g., 27 Fed. Reg. 1116 (1962) (complete embargo on imports from Cuba); 43 Dept. State Bull. 715 (1960) (denial of export licenses for most industrial exports to Cuba). For a more complete statement of the policies behind these restrictions and the circumstances that precipitated their imposition, see Report of the Special Committee to Study Resolutions II.1 and VIII of the Eighth Meeting of Consultation of Ministers of Foreign Affairs, OEA/Ser. G/IV,

"[E]xcept as specifically authorized by the Secretary of the Treasury," Regulation 201(b) prohibits all "transactions involv[ing] property in which [Cuba], or any national thereof, has . . . any interest of any nature whatsoever, direct or indirect . . . ." 31 CFR § 515.201(b) (1983).

In 1977, Regulation 560 was added to the Cuban Assets Control Regulations. See 31 CFR § 515.560 (1977).[5] Regulation 560 embodied a general license permitting "persons who visit Cuba to pay for their transportation and maintenance expenditures (meals, hotel bills, taxis, etc.) while in Cuba." 42 Fed. Reg. 16621 (1977). Thus, travel-related economic transactions with Cuba were, for the most part, exempted from the complete embargo of Regulation 201(b).[6] All persons engaging in travel-related transactions, however, were required to make "a full and accurate record of each such transaction" and to keep those records available for inspection for at least two years. § 515.601. And the general license contained in Regulation 560 was subject to revocation or modification "at any time." § 515.805.

Later in 1977, § 5(b) of TWEA was amended to limit the President's power to act pursuant to that statute solely to times of war.[7] In the same bill, a new law was enacted to

_____

pp. 14–16 (1963); Cuba, Dept. of State Pub. No. 7171, pp. 25–36 (1961). See also *Zemel* v. *Rusk*, 381 U. S. 1, 14–15 (1965).

[5] Regulation 560 was first passed on March 29, 1977. 42 Fed. Reg. 16621. It was amended on May 18, 1977, to further relax existing restrictions on travel-related transactions with Cuba. 42 Fed. Reg. 25499.

[6] Some restrictions remained. For example, travelers were not allowed to purchase merchandise in Cuba with a foreign market value in excess of $100. Moreover, such merchandise could be purchased for personal use only and could not be resold. 31 CFR § 515.560(a)(3) (1977). Also, scheduled air and sea travel to Cuba was still prohibited, § 515.560(a)(5), as were any contracts between domestic credit card issuers and any Cuban enterprises "for the extension of credit to any traveler for any purpose," § 515.560(a)(7).

[7] Title I, § 101, of Pub. L. 95–223, 91 Stat. 1625, amended § 5(b) of TWEA "by striking out 'or during any other period of national emergency

228

cover the President's exercise of emergency economic powers in response to peacetime crises. International Emergency Economic Powers Act (IEEPA), Title II, Pub. L. 95–223, 91 Stat. 1626 *et seq.*, codified at 50 U. S. C. § 1701 *et seq.* The authorities granted to the President by § 203 of IEEPA are essentially the same as those in § 5(b) of TWEA,[8] but the conditions and procedures for their exercise are different.

Section 202(a) of IEEPA provides that the authorities granted the President by § 203 "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U. S. C. § 1701(a). The President is also required, "in every possible instance," to consult with Congress prior to exercising his IEEPA authorities and, once such authorities have been exercised, to report to Congress every six months on the actions taken and any changes in the underlying circumstances. § 1703.[9]

However, rather than requiring the President to declare a new national emergency in order to continue existing economic embargoes, such as that against Cuba, Congress decided to grandfather existing exercises of the President's "national emergency" authorities. Section 101(b) of Public Law 95–223 provides:

"Notwithstanding the amendment made by subsection (a), the authorities conferred upon the President by section 5(b) of the Trading With the Enemy Act, which

declared by the President' in the text preceding subparagraph (A)." For the text of § 5(b) prior to this amendment, see n. 2, *supra.*

[8] See *Dames & Moore* v. *Regan,* 453 U. S. 654, 671 (1981). There are some differences, however. The grant of authorities in IEEPA does not include the power to vest (*i. e.,* to take title to) foreign assets, to regulate purely domestic transactions, to regulate gold or bullion, or to seize records. See H. R. Rep. No. 95–459, pp. 14–15 (1977).

[9] Congress has reserved to itself the authority to terminate any declared national emergency by concurrent resolution. 50 U. S. C. § 1622.

were being exercised with respect to a country on July 1, 1977, as a result of a national emergency declared by the President before such date, may continue to be exercised with respect to such country . . . ." 91 Stat. 1625, note following 50 U. S. C. App. § 5.

This grandfather provision also provided that "[t]he President may extend the exercise of such authorities for one-year periods upon a determination for each such extension that the exercise of such authorities with respect to such country for another year is in the national interest of the United States." *Ibid.* Presidents Carter and Reagan, in each of the years since TWEA was amended, have determined that the continued exercise of § 5(b) authorities with respect to Cuba is in the national interest.[10]

In 1982, in order to "reduce Cuba's hard currency earnings from travel by U. S. persons to and within Cuba," Regulation 560 was amended to curtail the general license permitting travel-related economic transactions. 47 Fed. Reg. 17030 (1982).[11] As amended, Regulation 560 only licenses travel-related economic transactions in connection with certain types of travel, such as official visits, news gathering, professional research, and visits to close relatives. 31 CFR § 515.560(a)(1) (1983). "[F]ully sponsored or hosted travel," which does not involve any economic benefit to Cuba, is also permitted. § 515.560(j). General tourist and business

---

[10] See 48 Fed. Reg. 40695 (1983); 47 Fed. Reg. 39797 (1982); 46 Fed. Reg. 45321 (1981); 45 Fed. Reg. 59549 (1980); 44 Fed. Reg. 53153 (1979); 43 Fed. Reg. 40449 (1978).

[11] Regulation 560 was amended again in July of that year to further clarify the scope of permissible travel-related transactions with Cuba. 47 Fed. Reg. 32060 (1982). For a statement of the policies behind the amendments, see Declaration of Thomas O. Enders, Assistant Secretary of State for Inter-American Affairs, ¶¶ 5–14, App. 172–177; Declaration of James H. Michel, Acting Assistant Secretary of State for Inter-American Affairs ¶¶ 3–7, App. 178–181; Declaration of Myles R. R. Frechette, Director, Office of Cuban Affairs, Department of State ¶¶ 4–10, App. 107–108. See also *infra*, at 243.

travel, however, is specifically excluded from the authorization contained in the general license.   § 515.560(a)(3).[12]

As noted, respondents challenged the amendment to Regulation 560 on a number of statutory and constitutional grounds.   Most important of these contentions, and the only one passed on by the court below, is the claim that the amendment is invalid because it was not promulgated in accordance with the procedures mandated by IEEPA.[13]   The Government agrees that it did not follow the procedures set out in IEEPA when it amended Regulation 560, but relies for statutory authority for the amendment on the grandfather clause of Public Law 95–223, which preserved those "authorities . . . being exercised" pursuant to § 5(b) of TWEA on July 1, 1977.   The Government argues that the "authority" to regulate travel-related transactions with Cuba was being exercised on July 1, 1977, as part of the general regulation of property transactions contained in Regulation 201(b).   Thus, even though most such transactions were not actually prohibited on July 1 because of the general license, the Government contends that the President's authority to prohibit them was preserved.

The Court of Appeals gave three reasons for rejecting the Government's argument based, in turn, on the plain language, the legislative history, and the underlying purpose of the 1977 amendment to TWEA.[14]   First, "as a matter of com-

---

[12] As amended, Regulation 560 provides that special licenses may be issued in appropriate cases for travel-related transactions by "persons desiring to travel to Cuba for humanitarian reasons, or for purposes of public performances, public exhibitions, or similar activities."   31 CFR § 515.560(b) (1983).

[13] Respondents also claimed that the 1982 travel restrictions violated the 1978 Passport Act, 22 U. S. C. § 211a, which prohibits area restrictions on passports except in certain circumstances; that they exceeded the authority conferred by TWEA and by IEEPA; and that they violated respondents' First and Fifth Amendment rights, including the right to travel, due process, and equal protection.   See Complaint ¶ 14, App. 9.

[14] The Court of Appeals for the Eleventh Circuit accepted the second and third of these reasons in striking down another regulation passed under the

mon sense and common English," the court stated, restricting commodity purchases and restricting travel purchases would seem to be very different "exercises" of authority— "different enough at least not to count as the exercise of the same authority." 708 F. 2d, at 796. Thus, since "the government was *not* restricting *travel* to Cuba" on July 1, 1977, its authority to do so was not grandfathered. *Ibid.* Second, the court thought that the legislative history showed that Congress intended the grandfather clause to be narrowly interpreted to allow the President to continue in effect only those specific "restrictions" actually in place on July 1, 1977. "It did not want the existence of one sort of TWEA restriction in 1977 to serve as a justification for imposing a new one." *Id.*, at 798.

Finally, the Court of Appeals concluded that the purpose behind the grandfather clause was solely to preserve current restrictions as bargaining chips in negotiations with the affected countries. To require the President to announce publicly a new declaration of emergency in order to preserve existing restrictions on transactions with those countries might have undesirable ramifications. On the other hand, simply to abandon the restrictions without any *quid pro quo* could be equally undesirable. Thus, the grandfather clause allowed current restrictions to remain in place. But, the court concluded, it would go beyond the purposes of the clause to permit the President to augment his bargaining powers by adding new restrictions. *Id.*, at 799–800.[15]

---

grandfather clause to the 1977 amendmends to TWEA. *United States* v. *Frade,* 709 F. 2d 1387, 1397–1402 (1983).

[15] The Court of Appeals bolstered its conclusion with two additional considerations. First, the court noted that our cases required it to "construe narrowly all delegated powers that curtail or dilute" the right to travel, *Kent* v. *Dulles,* 357 U. S. 116, 129 (1958), and that "[t]hat principle of narrow interpretation applies here." 708 F. 2d, at 800. Second, the court noted that in 1978 Congress amended the Passport Act, 22 U. S. C. § 211a, to prohibit the Executive Branch from imposing peacetime passport travel restrictions without the authorization of Congress, except for health and safety considerations. Pub. L. 95–426, § 124, 92 Stat. 971. "To interpret

## II

We find the reasoning of the Court of Appeals ultimately unconvincing on all three counts. The language of the grandfather clause, read in conjunction with § 5(b) of TWEA, supports the Government's contention that, in the relevant sense, the "authority" to regulate all property transactions with Cuba, including travel-related transactions, was being "exercised" on July 1, 1977 and was, therefore, preserved. And neither the legislative history nor the apparent purpose of the 1977 Act sufficiently supports the contrary contention that what Congress actually intended, despite the statutory language, was to freeze existing restrictions, so that any adjustment of pending embargoes would require the declaration of a new "national emergency" under the procedures of IEEPA.

The grandfather clause in Public Law 95–223 refers to the "authorities conferred upon the President by section 5(b) of the Trading with the Enemy Act." Among those authorities is the authority to "regulate . . . any . . . transactions involving . . . any property in which any foreign country or any national thereof has had any interest." 50 U. S. C. App. § 5(b). Section 5(b) draws no distinction between the President's authority over travel-related transactions and his authority over other property transactions. For purposes of TWEA, it is clear that the authority to regulate travel-related transactions is merely part of the President's general authority to regulate property transactions.[16] Thus, there is

_____

the 'savings clause' as the government suggests, would make the Passport Act amendment meaningless in terms of Cuba, for the Executive Branch could unilaterally impose Cuban travel restrictions by imposing currency restrictions as it did here." 708 F. 2d, at 801.

[16] Respondents argue that § 5(b) of TWEA never encompassed the power to regulate travel-related transactions. Brief for Respondents 21–31. In light of the sweeping statutory language, however, this argument borders on the frivolous. The President is authorized to regulate "any" transaction involving "any" property in which a foreign country or national thereof has "any" interest. Payments for meals, lodging, and transportation in

no basis for the Court of Appeals' conclusion, drawn without reference to the actual language of TWEA, that the regulation of travel-related purchases must be based on a separate authority from that governing the regulation of other transactions involving property. In fact, they are based on the same authority.[17]

It is also clear that the President's authority to regulate property transactions with Cuba and Cubans was being exercised on July 1, 1977. Regulation 201(b), which was in force on July 1, 1977, and continues in full force and effect today, explicitly prohibits, except as specifically authorized by the Secretary of the Treasury, all transactions involving prop-

---

Cuba are all transactions with respect to property in which Cuba or Cubans have an interest. Such transactions, therefore, fall naturally within the statutory language, and there is no indication that Congress intended to limit the President's power to control them in response to a national emergency. See *Dames & Moore* v. *Regan*, 453 U. S., at 672 ("both the legislative history and cases interpreting the TWEA fully sustain the broad authority of the Executive when acting under this congressional grant of power"); *Guessefeldt* v. *McGrath*, 342 U. S. 308, 319 (1952).

In the alternative, see Brief for Respondents 10–20, respondents argue that a 1978 amendment to the Passport Act, 22 U. S. C. § 211a, eliminated whatever authority the President once had to regulate travel-related transactions under TWEA. See Pub. L. 95–426, § 124, 92 Stat. 971. But the 1978 amendment to the Passport Act is directed solely to the authority of the Secretary of State to impose area restrictions on the use of United States passports. The amendment has nothing to do with, and makes no mention of, the President's authority to regulate transactions under TWEA. Since repeals by implication are not favored, *TVA* v. *Hill*, 437 U. S. 153, 189–190 (1978); *Morton* v. *Mancari*, 417 U. S. 535, 549 (1974), respondents' argument must be rejected. The Court of Appeals' reliance on the Passport Act in its construction of the grandfather clause, see n. 15, *supra*, is similarly unpersuasive.

[17] Further proof that Congress did not distinguish between travel-related transactions involving foreign property and other property transactions, either when TWEA was first passed or when it was amended in 1977, is provided by § 203(a) of IEEPA. Section 203(a), which delineates the authorities of the President following a declaration of national emergency under the new procedures of IEEPA, merely tracks the language of § 5(b) of TWEA. See n. 8, *supra*.

erty in which Cuba or Cuban nationals have "any interest of any nature whatsoever, direct or indirect." 31 CFR § 515.201(b) (1983). Thus, absent an explicit license, *all* transactions involving Cuban property are and, at all relevant times, have been prohibited.

On July 1, 1977, most travel-related transactions with Cuba and Cuban nationals were permitted by a general license. But that does not change the fact that the President was exercising his § 5(b) authorities with respect to those transactions. Section 5(b) specifically states that the authorities granted therein may be exercised "by means of instructions, licenses, or otherwise." On July 1, 1977, the President was exercising his authority over travel-related transactions with Cuba and Cubans by means of a general license which exempted them from the categorical prohibition of Regulation 201(b).

At that time, travel-related transactions involving Cuban property were still subject to the recordkeeping requirements of 31 CFR § 515.601 (1977). Other restrictions were also imposed. See n. 6, *supra*. And the general license was expressly subject to revocation, amendment, or modification "at any time." § 515.805. Thus, travel-related transactions "were specifically made subordinate to further actions which the President might take . . . ." *Dames & Moore* v. *Regan*, 453 U. S. 654, 673 (1981). And when the general license was amended in 1982, so that most travel-related transactions were no longer specifically authorized, such transactions automatically became subject, once again, to the prohibition of Regulation 201(b).[18]

---

[18] We think that the Court of Appeals for the First Circuit may have been confused as to some aspects of the Cuban embargo. The court states that respondents are prevented from traveling to Cuba by "a Treasury Department regulation that prohibits them . . . from paying for 'transportation-related' expenses 'ordinarily incident to travel to and from Cuba' and for any other expenses 'ordinarily incident to travel within Cuba, including payment of living expenses and the acquisition in Cuba of goods for per-

Since the authority to regulate travel-related transactions was among those "authorities conferred upon the President" by § 5(b) of TWEA "which were being exercised" with respect to Cuba on July 1, 1977, it seems to us to follow from a natural reading of the grandfather clause that the authority to regulate such transactions "may continue to be exercised" with respect to Cuba after that date. Pub. L. 95–223, § 101(b), 91 Stat. 1625. And since the President's authority under § 5(b) to regulate by means of licenses includes the authority to "prevent or prohibit" as well as the authority to "direct and compel," 50 U. S. C. App. § 5(b)(1)(B), it also follows that the grandfather clause constitutes adequate statutory authority for the 1982 amendment to the general license, the practical effect of which was to prevent travel to Cuba.

A contrary, more constricted reading of the grandfather clause does undue violence to the words chosen by Congress. The clause refers to "authorities" being exercised on July 1, 1977, not to "prohibitions" actually in place on that date. And it provides that those authorities "may continue to be

---

sonal consumption there.'  31 CFR § 515.560 (1982)."  708 F. 2d, at 795. But, of course, 31 CFR § 515.560 (1983) does not prevent respondents from doing anything.  As amended, it merely fails to include them in the license that it grants to some persons.  Regulation 201(b)'s general prohibition on transactions involving property in which Cuba or Cubans have an interest is what, as a practical matter, prevents respondents from traveling to Cuba.

On the next page of its opinion, the court states that "[a]lthough the Treasury Department regulated travel to Cuba by means of regulations of the sort here at issue from 1963 to early 1977, on March 29, 1977, the Department repealed those travel restrictions . . . ."  Id., at 796.  Again, there were no separate "travel restrictions," either to be repealed in 1977 or reimposed in 1982.  The source of all restrictions on property transactions is Regulation 201(b), which has been in effect continuously since 1963. Properly understood, the structure of the Cuban embargo undercuts the argument that restrictions on travel purchases and restrictions on commodities purchases are "very different" exercises of authority.

exercised." If Congress had wished to freeze existing restrictions, it could easily have done so explicitly. The fact that it did not do so, but instead used the generic term "authorities," indicates that Congress intended the President to retain some flexibility to adjust existing embargoes.

The Court of Appeals felt that its more constricted reading of the grandfather clause comported with the legislative history surrounding the enactment of Public Law 95–223. We would certainly agree that the following colloquy between Representative Cavanaugh and Assistant Secretary of the Treasury Bergsten, the administration's spokesman for the bill, supports a narrow reading of the grandfather clause:

> "MR. CAVANAUGH. ... First of all, Mr. Bergsten, would it be your understanding that [the grandfather clause] would strictly limit and restrict the grandfathering of powers currently being exercised under 5(b) [of TWEA] to those specific uses of the authorities granted in 5(b) being employed as of June 1, 1977.
> "MR. BERGSTEN. Yes, sir.
> "MR. CAVANAUGH. And it would preclude the expansion by the President of the authorities that might be included in 5(b) but are not being employed as of June 1, 1977.
> "MR. BERGSTEN. That is right." [19]

We also agree that a narrow construction at least appears to be supported by Representative Bingham's objections to, and the subsequent elimination of, language in a Subcommittee staff draft which would have expressly grandfathered presently unused authorities of the President under § 5(b) of TWEA so long as they were used to deal with a "set of

---

[19] Revision of Trading with the Enemy Act: Markup before the House Committee on International Relations, 95th Cong., 1st Sess., 21 (1977) (hereinafter cited as Markup).

circumstances" already being dealt with under some other authority.[20]

But even if these were the only available indications of congressional intent apart from the language which Congress enacted, we would have grave doubts that they were sufficient to overcome what seems to us to be the clear, generic meaning of the word "authorities." Oral testimony of witnesses and individual Congressmen, unless very precisely directed to the intended meaning of particular words in a statute, can seldom be expected to be as precise as the enacted language itself. To permit what we regard as clear statutory language to be materially altered by such colloquies, which often take place before the bill has achieved its final form, would open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on by Congress and signed into law by the President.

---

[20] Emergency Controls on International Economic Transactions: Hearings before the Subcommittee on International Economic Policy and Trade of the House Committee on International Relations, 95th Cong., 1st Sess., 167 (1977) (hereinafter cited as Emergency Controls Hearings). Understood in context, however, the fact that such language was deleted from the Subcommittee draft is at best ambiguous. In response to a request by Representative Bingham for the administration's reaction to the draft language, Mr. Santos from the Department of the Treasury testified on June 9, 1977, over two months after Regulation 560 was promulgated, that the language was unnecessary because the President was in fact exercising all of the authorities provided by § 5(b) of TWEA: "We have reviewed the powers conferred under this draft. Frankly we believe that all the powers conferred are exercised and that there are no additional powers that could be exercised that are not already exercised." *Id.*, at 188. Representative Bingham then stated: "You have said, as I understand it, that there is no need for subparagraph 2 [grandfathering presently unused powers], that you would not be disturbed by the elimination of paragraph 2." *Ibid.* Thus, the challenged language may simply have been deleted as surplusage. If so, the deletion supports the view that the phrase "authorities being exercised" embraces much more than simply those restrictions actually in place on July 1, 1977.

In our opinion, a full examination of the legislative history—the Subcommittee hearings, markup sessions, floor debates, and House and Senate Reports—does not support the view that only those restrictions actually in place on July 1, 1977, were to be grandfathered.[21] The crucial point is that the discussion, even in the Cavanaugh and Bingham excerpts, is consistently carried on in terms of existing "powers" and "authorities," not in terms of existing "restrictions" or "prohibitions."[22] The legislative history simply does not

[21] The Court of Appeals read that history in light of its erroneous conclusion that the regulation of travel purchases is wholly different from the regulation of other transactions involving Cuban property. See *supra*, at 232–233, and n. 18. The Court of Appeals also freely substituted the word "restrictions" for "authorities" in drawing its conclusions from the legislative history. See 708 F. 2d, at 798. Thus, the court fastened onto isolated statements to the effect that only existing "uses" of authority were to be grandfathered, and concluded that since travel restrictions were not currently being used, such restrictions could not now be imposed. *Ibid.*

We have already discussed the flaws in this argument. When the language of the grandfather clause is read in light of § 5 of TWEA and the structure of the Cuban Assets Control Regulations in effect on July 1, 1977, it becomes clear that the President's authority to regulate all property transactions with Cuba and Cuban nationals, including travel-related transactions, was being "used" on the relevant date. One might argue that the phrase "uses of authorities" is somehow narrower than the phrase "authorities . . . being exercised" and that the former refers only to specific restrictions. But even if such an argument does not parse concepts too finely, the fact remains that the latter phrase, not the former, was enacted into law.

[22] See, *e. g.*, H. R. Rep. No. 95–459, pp. 1, 7, 10, 12–13 (1977); S. Rep. No. 95–466, pp. 1, 4 (1977); Emergency Controls Hearings, at 207 (remarks of Rep. Bingham); *id.*, at 147–148 (remarks of Mr. Majak), *id.*, at 168 (remarks of Rep. Cavanaugh); Markup, at 7 (prepared statement of Rep. Bingham); *id.*, at 21 (remarks of Rep. Cavanaugh); 123 Cong. Rec. 22476 (1977) (remarks of Rep. Bingham).

There are even explicit statements in the legislative history that the regulation of travel-related transactions was among the "authorities being exercised with regard to Cuba . . . ." Emergency Controls Hearings, at 215 (remarks of Mr. Santos); *id.*, at 197 (remarks of Mr. Majak, Staff Director of Subcommittee on International Economic Policy and Trade) ("[T]he news media, in the case of Cuba objected to the fact that they are

countenance the suggestion that Congress really meant "restrictions" even though it wrote "authorities."

Finally, we reject the Court of Appeals' view that the purpose of the grandfather clause was merely to preserve existing bargaining chips in negotiations with affected countries. There are some statements in the Subcommittee hearings to the effect that existing embargoes should not be abandoned without exacting some sort of negotiated *quid pro quo*.[23] But it is clear that the prime reason that existing embargoes were grandfathered was to keep the bill, H. R. 7738—which included IEEPA as well as the amendments to TWEA—from becoming too controversial. Members of the Subcommittee feared that if current embargoes were implicated the bill would bog down in partisan disputes, thereby delaying implementation of the new procedures of IEEPA.[24]

The House Report is explicit on this point.

"Certain current uses of the authorities affected by H. R. 7738 are controversial—particularly the total U. S. trade embargoes of Cuba and Vietnam. The committee considered carefully whether to revise, or encourage the President to revise, such existing uses of international economic transaction controls, and thereby the policies they reflect, in this legislation. The committee decided that to revise current uses, and to improve policies and procedures that will govern future uses, in a single bill would be difficult and divisive. Committee members concluded that improved procedures for future use of emergency international economic powers should take precedence over changing existing uses. By

---

subjected to a licensing process in order to travel to certain embargoed countries. That was certainly a part of the exercise of the authorities").

[23] See *id.*, at 103 (statement of Mr. Bergsten); *id.* at 12 (statement of Prof. Andreas F. Lowenfeld).

[24] See Markup, at 7–8 (prepared statement of Rep. Bingham); Emergency Controls Hearings, at 207 (summary of staff draft); *id.* at 198 (remarks of Rep. Whalen); *id.*, at 190–191 (remarks of Mr. Santos); *id.*, at 168 (remarks of Rep. Bingham).

'grandfathering' existing uses of these powers, without either endorsing or disclaiming them, H. R. 7738 adheres to the committee's decision to try to assure improved future uses rather than remedy possible past abuses." H. R. Rep. No. 95–459, pp. 9–10 (1977).

Hewing to this noncontroversial approach, Representative Bingham, the Chairman of the responsible House Subcommittee, assured the Members of the House that "this legislation specifically grandfathers the embargoes against Vietnam, Cambodia, Laos, Cuba, and other existing embargoes, so that *they are not affected in any way by this legislation.*" 123 Cong. Rec. 38166 (1977) (emphasis added). Our reading of the grandfather clause is consistent with these clear statements of its purpose and effect. Eliminating the President's authority to modify existing licenses in response to heightened tensions with Cuba would have sparked just the sort of controversy the grandfather clause was designed to avoid. See Emergency Controls Hearings, at 207 (summary of staff draft); *id.*, at 210 (remarks of Rep. Bingham).

## III

Respondents finally urge that if we do find that the President is authorized by Congress to enforce the regulations here in question, their enforcement violates respondents' right to travel guaranteed by the Due Process Clause of the Fifth Amendment. Respondents rely on a number of our prior decisions which recognized such a right, beginning in 1958 with *Kent* v. *Dulles,* 357 U. S. 116. Respondents' counsel undoubtedly speaks with some authority as to these cases, since he represented the would-be travelers in most of them.

In *Kent,* the Court held that Congress had not authorized the Secretary of State to inquire of passport applicants as to affiliation with the Communist Party. The Court noted that the right to travel "is a part of the 'liberty' of which the citizen cannot be deprived without due process of law," *id.*, at 125, and stated that it would "construe narrowly all dele-

gated powers that curtail or dilute" that right.   *Id.*, at 129.[25]
Subsequently, in *Aptheker* v. *Secretary of State*, 378 U. S.
500, 514 (1964), the Court held that a provision of the Subver-
sive Activities Control Act of 1950, 64 Stat. 993, forbidding
the issuance of a passport to a member of the Communist
Party, "sweeps too widely and too indiscriminately across the
liberty guaranteed in the Fifth Amendment."

Both *Kent* and *Aptheker*, however, were qualified the fol-
lowing Term in *Zemel* v. *Rusk*, 381 U. S. 1 (1965).   In that
case, the Court sustained against constitutional attack a
refusal by the Secretary of State to validate the passports of
United States citizens for travel to Cuba.   The Secretary of
State in *Zemel*, as here, made no effort selectively to deny
passports on the basis of political belief or affiliation, but
simply imposed a general ban on travel to Cuba following the
break in diplomatic and consular relations with that country
in 1961.   The Court in *Zemel* distinguished *Kent* on grounds
equally applicable to *Aptheker*.

> "It must be remembered . . . that the issue involved in
> *Kent* was whether a citizen could be denied a passport
> because of his political beliefs or associations. . . . In this
> case, however, the Secretary has refused to validate
> appellant's passport not because of any characteristic
> peculiar to appellant, but rather because of foreign policy
> considerations affecting all citizens." 381 U. S., at 13.

The Court went on to note that, although the ban in ques-
tion effectively prevented travel to Cuba, and thus dimin-
ished the right to gather information about foreign countries,
no First Amendment rights of the sort that controlled in *Kent*
and *Aptheker* were implicated by the across-the-board re-

---

[25] In *Kent*, 357 U. S., at 126–127, the constitutional right to travel within
the United States and the right to travel abroad were treated indiscrimi-
nately.   That position has been rejected in subsequent cases.   See *Haig* v.
*Agee*, 453 U. S. 280, 306 (1981) ("the *freedom* to travel outside the United
States must be distinguished from the *right* to travel within the United
States"); *Califano* v. *Aznavorian*, 439 U. S. 170, 176–177 (1978).

striction in *Zemel*. And the Court found the Fifth Amendment right to travel, standing alone, insufficient to overcome the foreign policy justifications supporting the restriction.

> "That the restriction which is challenged in this case is supported by the weightiest considerations of national security is perhaps best pointed up by recalling that the Cuban missile crisis of October 1962 preceded the filing of appellant's complaint by less than two months." 381 U. S., at 16.

We see no reason to differentiate between the travel restrictions imposed by the President in the present case and the passport restrictions imposed by the Secretary of State in *Zemel*. Both have the practical effect of preventing travel to Cuba by most American citizens, and both are justified by weighty concerns of foreign policy.[26]

Respondents apparently feel that only a Cuban missile crisis in the offing will make area restrictions on international travel constitutional. They argue that there is no "emergency" at the present time and that the relations between Cuba and the United States are subject to "only the 'normal' tensions inherent in contemporary international affairs." Brief for Respondents 55. The holding in *Zemel*, however, was not tied to the Court's independent foreign policy analysis. Matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 589 (1952). Our holding in *Zemel* was merely an example of this classical deference to the political branches in matters of foreign policy.

---

[26] *United States* v. *Laub*, 385 U. S. 475 (1967), upon which respondents also rely, involved only a statutory question of whether an indictment properly charged a crime under the laws of the United States. In our view, the case sheds no light on the issues presented here.

The Cuban Assets Control Regulations were first promulgated during the administration of President Kennedy. They have been retained, though alternately loosened and tightened in response to specific circumstances, ever since. In every year since the enactment of IEEPA in 1977, first President Carter and then President Reagan have determined that the continued exercise of the authorities of § 5(b) of TWEA against Cuba is in the national interest. See n. 10, *supra.* Since both were acting under the grandfather clause of Public Law 95–223, there was no legal requirement that either of them proclaim a new national emergency under the procedures of IEEPA. But the absence of such a proclamation does not detract from the evidence presented to both the District Court and the Court of Appeals to the effect that relations between Cuba and the United States have not been "normal" for the last quarter of a century, and that those relations have deteriorated further in recent years due to increased Cuban efforts to destabilize governments throughout the Western Hemisphere. See Enders Declaration ¶ 5, App. 172.

In the opinion of the State Department, Cuba, with the political, economic, and military backing of the Soviet Union, has provided widespread support for armed violence and terrorism in the Western Hemisphere. Cuba also maintains close to 40,000 troops in various countries in Africa and the Middle East in support of objectives inimical to United States foreign policy interests. See Frechette Declaration ¶ 4, App. 107. Given the traditional deference to executive judgment "[i]n this vast external realm," *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 319 (1936), we think there is an adequate basis under the Due Process Clause of the Fifth Amendment to sustain the President's decision to curtail the flow of hard currency to Cuba—currency that could then be used in support of Cuban adventurism—by restricting travel. *Zemel* v. *Rusk, supra,* at 14–15; *Haig* v. *Agee,* 453 U. S. 280, 306–307 (1981).

## IV

In sum, we conclude, based on an analysis of the language of the grandfather clause as well as its purpose and legislative history, that the grandfathered authorities of § 5(b) of TWEA provide an adequate statutory basis for the 1982 amendment restricting the scope of permissible travel-related transactions with Cuba and Cuban nationals. We also conclude that such restrictions do not violate the freedom to travel protected by the Due Process Clause of the Fifth Amendment.

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE POWELL join, dissenting.

All parties concede that the 1982 restrictions on travel-related expenditures in Cuba, 47 Fed. Reg. 17030 (1982), were not promulgated in conformity with the procedural requirements of the International Emergency Economic Powers Act of 1977, Pub. L. 95–223, Title II, 91 Stat. 1626, 50 U. S. C. §§ 1701–1706 (IEEPA). Thus, those restrictions are invalid unless they were authorized by § 101(b) of Pub. L. 95–223, 91 Stat. 1625, the grandfather clause of the IEEPA. Because I do not agree that the grandfather clause encompasses the exercise of Presidential power at issue here, I would affirm the judgment of the United States Court of Appeals for the First Circuit.

## I

Congress promulgated Public Law 95–223 to address problems unforeseen by the drafters of the Trading With the Enemy Act of 1917, 40 Stat. 411, as amended, 50 U. S. C. App. § 1 *et seq.* (TWEA). The TWEA was one of several statutes that reflected Congress' conclusion that the President should have increased authority in times of war or national emergency in order to respond to such crisis situations with the coordinated alacrity they require. Accord-

ingly, the TWEA provided the President with a broad range of powers over international trade in time of war or "national emergency."

Although TWEA provided clear procedures for enhancing the authority of a President when an emergency arose, the Act contained no similar provision to reduce the President's authority to its normal scope when the emergency subsided. Once the President had declared a state of national emergency, the emergency officially continued to exist until the President declared that it had ended. Until such a declaration of termination was made, the President enjoyed the broad authority that the TWEA conferred upon him to address the original emergency. The historical record shows that once a President had declared the existence of a national emergency, he was slow to terminate it even after the circumstances or tensions that had led to the declaration could no longer be said to pose a threat of emergency proportion to the Nation. See generally Emergency Controls on International Economic Transactions: Hearings before the Subcommittee on International Economic Policy and Trade of the House Committee on International Relations, 95th Cong., 1st Sess., 16–19 (1977) (Subcommittee Hearings) (statement of Prof. Andreas F. Lowenfeld); id., at 27–31 (statement of Prof. Harold G. Maier).

Because of this pattern of behavior, TWEA emergency authority operated as a one-way ratchet to enhance greatly the President's discretionary authority over foreign policy. At the time that Congress began to consider amendments to the TWEA, the United States technically faced four declared states of "emergency." Among the four were President Franklin D. Roosevelt's 1933 Bank Holiday Declaration, Presidential Proclamation No. 2040, 48 Stat. 1691; President Nixon's 1970 declaration concerning a Post Office strike, Presidential Proclamation No. 3972, 3 CFR 473 (1966–1970 Comp.); and President Nixon's 1971 declaration concerning the country's balance-of-payments problems, Presidential Proclamation No. 4074, 3 CFR 60 (1971–1975 Comp.). The

national emergency most often invoked in connection with exercises of TWEA powers was the emergency that had been declared on December 16, 1950, by President Truman in response to the developing Korean conflict. Presidential Proclamation No. 2914, 64 Stat. A454. That Proclamation warned of the threat of Communist aggression. Because of this declaration of emergency, the President retained broad authority of indefinite duration to respond to anything that logically could be related to the general threat of the spread of Communism.

There was widespread feeling that this broad grant of emergency powers conflicted with the intent of the TWEA, which sought to empower a President to respond to situations that presented an imminent threat requiring immediate response.[1] The expert witnesses who testified before the House Subcommittee expressed a general consensus that § 5(b) of the TWEA inappropriately had been used as a flexible instrument of foreign policy in nonemergency situations. See, *e. g.*, Subcommittee Hearings, at 13–14, 16 (statement of Prof. Andreas F. Lowenfeld) ("no practical constraint limiting actions taken under emergency authority to measures related to the emergency"); *id.*, at 22–23 (statement of Prof. Harold G. Maier) ("combination of legislative permissiveness and executive assertiveness over the past 40 years has created a significant shift in the functional allocations of constitutional power to regulate foreign commerce"); *id.*, at 39 (statement of Prof. Stanley D. Metzger) (suggesting

---

[1] Congressional scrutiny of the TWEA powers was part of a larger effort to review the bases of all the President's emergency powers. In 1976, Congress enacted the National Emergencies Act, Pub. L. 94–412, 90 Stat. 1255, 50 U. S. C. § 1601 *et seq.*, which, by its § 101(a), provided that powers exercised pursuant to existing states of national emergency would be terminated within two years after its date of enactment. The National Emergencies Act, however, exempted § 5(b) of the TWEA and several other provisions from that 2-year termination requirement in order to afford Congress the opportunity for more thorough consideration of the powers and procedures conferred upon the President by those provisions. §§ 502(a)(1) and (b), 90 Stat. 1258, 1259; Subcommittee Hearings, at 1–2.

necessary checks and limitations on executive use of § 5(b) powers); *id.*, at 83 (statement of Peter Weiss, Center for Constitutional Rights) (TWEA "a prime example of the unchecked proliferation of Presidential power for purposes totally unforeseen by the creators of that power").

The Members of Congress who heard the testimony found it convincing. See, *e. g.*, H. R. Rep. No. 95–459, p. 7 (1977) (§ 5(b) "has become essentially an unlimited grant of authority"); Revision of Trading with the Enemy Act, Markup before the House Committee on International Relations, 95th Cong., 1st Sess., 8 (1977) (House Markup) (statement of Rep. Bingham) ("Section 5(b) has become a grab-bag of authorities which Presidents have been able to use to do virtually anything for which they could find no specific authority"). House Subcommittee Members also believed that some of the actions taken by the Executive Branch under the TWEA had, at most, a shaky foundation in actual emergency situations. In an exchange with Assistant Secretary of State Julius L. Katz, Subcommittee Chairman Bingham voiced his incredulity concerning the bases for certain then-effective regulations promulgated under § 5(b):

> "MR. BINGHAM. Mr. Katz, what is the national emergency currently facing us that warrants the use of powers under the [TWEA]? . . .
>
> "MR. KATZ. It continues to be the emergency involving the threat of Communist aggression which was declared in 1950 at the time of the aggression in Korea.
>
> "MR. BINGHAM. Are you serious?
>
> "MR. KATZ. That is the national emergency, Mr. Chairman, and it continues.
>
> "MR. BINGHAM. The emergency is the emergency that existed in 1950?
>
> "MR. KATZ. It has not been terminated." Subcommittee Hearings, at 110.[2]

---

[2] See also *id.*, at 117, 119 (remarks of Rep. Bingham) (referring specifically to lack of emergency with Cuba).

Dissatisfied generally with the responses of spokesmen from the Executive Branch, Representative Bingham criticized the administration's lack of cooperation in the effort to amend the TWEA. He further observed:

"Now I think that you have to face the facts, which are that the executive branch wants to be free to continue to act with an enormous degree of discretion on the basis that an emergency exists, although by no commonsense application of the term could the situation be called an emergency.

"The threat of Communist aggression, if you will, or the threat of Communist competition which we face in the world, Mr. Katz, is a permanent situation. It is not an emergency unless you are going to define the situation that exists in the world today as a permanent emergency. I don't see how you justify use of the term.

．　　　　．　　　　．　　　　．　　　　．

"Up until now the reaction of the subcommittee, and the reaction of the witnesses that we have had, has been that the situation that we are in is quite an incredible one, and it has to be substantially altered to try to conform with reality and with principle." *Id.*, at 113–114.

It is clear that Congress intended to curtail the discretionary authority over foreign affairs that the President had accumulated because of past "emergencies" that no longer fit Congress' conception of that term. To accomplish this goal, Congress amended the TWEA and enacted the IEEPA. Congress left intact the powers that the TWEA had conferred upon the President during time of war, but removed from the TWEA the authority for Presidential action in a national emergency. As a substitute for those powers, Congress promulgated the IEEPA to confer power upon the President in national-emergency situations. The substantive reach of the President's power under the IEEPA is

slightly narrower than it had been under the TWEA,[3] and Congress placed several procedural restrictions on the President's exercise of the national-emergency powers, including congressional consultation, review, and termination.

The prospective nature of the IEEPA left Congress with the dilemma of how to deal with existing regulations that had been promulgated under § 5(b) and obviously had not been issued in accordance with the new procedures set forth in the IEEPA. There were those on the House Subcommittee considering the amendments to the TWEA who thought that there should be no grandfathering and that the existing regulations should be allowed to expire. See, *e. g.*, Subcommittee Hearings, at 167, 168–169, 198 (remarks of Rep. Cavanaugh); *id.*, at 210 (remarks of Rep. Findley); *id.*, at 119 (colloquy between Rep. Bingham and Assistant Treasury Secretary Bergsten). Such an approach would have required the President to evaluate each situation in which regulations were in effect and to determine whether the need for reinstitution of the regulations justified a new declaration of national emergency. Others believed that Congress should conduct such a review and determine which restrictions were still justified by current exigencies. See H. R. Rep. No. 95–459, at 9–10. In response to two related concerns, however, the view that there was a need for some sort of grandfathering finally carried the day.

The first argument supporting a grandfather clause was the desire to preserve the administration's bargaining position in dealing with countries that were the subject of existing embargoes and asset freezes. Testimony before the

---

[3] Four powers conferred upon the President by the TWEA were not included in the powers conferred upon the President for use in time of national emergency under the IEEPA. Those four powers are: (1) the power to take title to foreign property; (2) the power to regulate purely domestic transactions; (3) the power to regulate gold or bullion; and (4) the power to seize records.

250

House Subcommittee expressed the view that the President should not be forced by Congress to make unilateral concessions to countries that had been the targets of exercises of § 5(b) authorities. In other words, many believed that the President should not be forced to give up "bargaining chips" without receiving something in return from the countries on the other side of the negotiations. Subcommittee Hearings, at 19 (statement of Prof. Lowenfeld) ("perhaps [the Cuba embargo] should not be terminated . . . without a quid pro quo"); *id.*, at 103, 113, 119 (statements of Assistant Treasury Secretary Bergsten) (unilateral termination of embargoes "would severely undermine the U. S. negotiating position with those countries, and our worldwide posture"); 123 Cong. Rec. 22477 (1977) (remarks of Rep. Whalen).

The second argument in favor of some form of a grandfather clause was related to the first. Several of the witnesses who testified at the hearings on the bill felt that the President should not be faced with the need to declare a new national emergency in order to continue existing restrictions. Such a declaration would have foreign policy reverberations of its own, and might inject new tension into a sensitive situation in which tensions were on the decline. See, *e. g.*, Subcommittee Hearings, at 19 (statement of Prof. Lowenfeld); *id.*, at 191–192 (remarks of Mr. Santos, Treasury Department attorney adviser). It would have been incongruous, in other words, for Congress to force the President to declare new emergencies in nonemergency situations simply to avoid having to end restrictions that, for negotiating reasons, the President had concluded should not be ended unilaterally.

The proponents of grandfathering voiced their desire that the grandfather clause be tailored narrowly to fit these concerns. In its early form before the Subcommittee, the clause contained two subparts, §§ 101(b)(1) and (2), which read:

"(1) any authority conferred upon the President by section 5(b) of the Trading with the Enemy Act, which is being exercised with respect to a set of circumstances on the date of enactment of this Act as a result of a national

emergency declared by the President before such date of enactment, may continue to be exercised with respect to such set of circumstances; and

"(2) *any other authority conferred upon the President by that section may be exercised to deal with the same set of circumstances.*"   Subcommittee Working Draft of June 8, 1977, 95th Cong., 1st Sess., § 101(b) (emphasis added).

In response to a question about the meaning of § 101(b)(2), Subcommittee Staff Director R. Roger Majak explained the purposes of the provision:

"[W]ith respect to any uses of 5(b) authorities for any presently existing situation, not only could the President use those particular authorities that he is now using, but any others which are conferred by section 5(b).

"So if the President is presently using asset controls toward a particular country, but is not using, let us say, currency controls, he nonetheless could use, at some later date if he so desired, currency controls with respect to the situation.

.          .          .          .          .

"I think it boils down to a question of whether we are grandfathering a particular situation, and all the powers that may be necessary to deal with the situation, or whether we are grandfathering the particular authorities themselves and their usage."   Subcommittee Hearings, at 167.

Representative Bingham voiced his opposition to such a broad grandfather clause.

"I have a serious question about that.   It seems to me that if the President has not up to now used some authority that he has under section 5(b) in connection with those cases where 5(b) has been applied, I don't know why it should be necessary to give him authority to expand what has already been done.   It is really going beyond grandfathering.

"It seems to me that grandfathering applies to what has been done to date, and that should be ample authority." *Ibid.*

Section 101(b)(2) was removed from the draft bill presented to the Committee.[4]   I can think of few sorts of information

---

[4] I am not persuaded by the Court's attempt to minimize the significance of the deletion of § 101(b)(2).   See *ante*, at 237, n. 20.   First of all, when the colloquy between Mr. Santos (Treasury Department attorney adviser) and Representative Bingham is read in context, it is clear that the major area of concern for both Mr. Santos and Representative Bingham was the question of what conditions should be placed on the President's ability to continue to exercise those authorities that were currently being exercised under § 5(b), *i. e.*, whether the President should be required to declare a continuing national emergency or merely be required to declare that continued exercise is in the national interest.   A careful reading of the entire testimony of Mr. Santos, see Subcommittee Hearings, at 187–197, suggests that, at various points, Representative Bingham and Mr. Santos were not understanding one another's questions and comments.   There was never any "meeting of the minds" on the import of Mr. Santos' comment that all "the powers conferred [were being] exercised and that there [were] no additional powers that could be exercised that [were] not already [being] exercised." *Id.*, at 188.

Further, it is nonsensical to assume that Mr. Santos meant, or that Representative Bingham could have understood him to mean, that *all* § 5(b) powers were being exercised with respect to the countries that were currently the subject of regulations promulgated under § 5(b).   For example, both participants in the conversation were well aware that in addition to the embargoes of North Korea, Vietnam, Cambodia, and Cuba, there were in effect Transaction Control Regulations, 31 CFR § 505.10 *et seq.* (1977), which prohibited any "person within the United States" from purchasing from any foreign country strategic commodities destined for a Communist country, and Foreign Funds Control Regulations, 31 CFR § 520.01 *et seq.* (1977), which blocked certain assets of East Germany, Czechoslovakia, Latvia, Lithuania, and Estonia that had been blocked during World War II.   No party to this litigation and nothing in the legislative history suggest that there is any support for the view that all powers under § 5(b) were being exercised with respect to all these countries.   Mr. Santos' statement is ambiguous and confusing, and I do not think it wise to allow this single, isolated exchange to cast a shadow of doubt over the clear import of the deletion of § 101(b)(2).

routinely found in legislative histories that would give a clearer indication that Congress intended to grandfather only the regulations and restrictions that already had been exercised.[5]

When the full House Committee viewed § 101(b) after § 101(b)(2) had been deleted, Representative Cavanaugh sought to ascertain that the clause was drawn as narrowly as possible to include only those regulations currently in effect:

> "MR. CAVANAUGH. . . . First of all, Mr. Bergsten, would it be your understanding that section 101 would strictly limit and restrict the grandfathering of powers currently being exercised under 5(b) to those specific uses of the authorities granted in 5(b) being employed as of June 1, 1977.
>
> "MR. BERGSTEN. Yes, sir.
>
> "MR. CAVANAUGH. And it would preclude the expansion by the President of the authorities that might be included in 5(b) but are not being employed as of June 1, 1977.
>
> "MR. BERGSTEN. That is right." House Markup, at 21.

In explaining the effect of the grandfather clause to the full House Committee, Representative Bingham stressed that

---

[5] That the Subcommittee wanted the grandfather clause to be read narrowly is also evinced by suggestions that the Subcommittee find ways to convey its intention that the grandfather provision be tightly construed. Subcommittee Hearings, at 212 (remarks of Rep. Findley). In response, Representative Bingham suggested that the changes in the bill discussed during the hearings be incorporated and that the bill be reported to the full Committee before further amendments were made. Obviously sympathetic to any means of clearly delimiting the scope of the grandfather clause, Representative Bingham, who had suggested deleting § 101(b)(2), encouraged Representative Findley to present his suggestions to narrow the scope of the clause to the full Committee if Representative Findley felt that such narrowing were still necessary after the bill had been amended according to the Subcommittee's specifications. Subcommittee Hearings, at 212.

the grandfather clause would leave intact "specific current uses of 5(b) authorities" and emphasized that the bill "neither condones nor condemns existing policies." *Id.*, at 7.

It is important to emphasize that the decision to grandfather the specific uses of authorities being exercised at a certain date did not reflect congressional acknowledgment that those uses of authorities were in fact addressed to true emergency situations. To the contrary, Congress openly expressed its view that many of the grandfathered restrictions had no real basis in an emergency situation. H. R. Rep. No. 95–459, at 11 (few current uses could be justified as responding to existing emergency situations). Responding to this sentiment, Congress expressly provided annual procedures governing the continuation of grandfathered authorities that are different from the procedures that govern the continued exercise of any new restrictions entered pursuant to a new state of emergency. With respect to future exercises of emergency power, the President's decision to continue in effect the proclamation of national emergency, and the regulations promulgated thereunder, are subject to semiannual review by Congress. See 50 U. S. C. §§ 1622(b), 1641(c). With respect to grandfathered authorities, the grandfather clause requires only that the President find continued exercise of the authority to be in the national interest. § 101(b), 50 U. S. C. App. § 5; Subcommittee Hearings, at 208. In this way, the Subcommittee avoided perpetuating the "phony character" of the national emergencies under which current exercises of § 5(b) power were promulgated. *Id.*, at 210. See also, *id.*, at 193 (statement by Mr. Santos, Treasury Department attorney adviser) (administration would have difficulty making good-faith declaration of current national emergency with respect to Cuba); House Markup, at 3 (remarks of Rep. Bingham).

In sum, the grandfather provision of the IEEPA was designed narrowly to respond to a particularized set of

concerns. It sought to avoid placing the President in the awkward situation either of making unilateral concessions to countries subject to restrictions or declaring a new state of emergency with respect to a country where none, in fact, existed. Congress concluded that these objectives were served fully with a grandfather clause that preserved existing restrictions, but gave the President no authority to impose new restrictions except through the new IEEPA procedures that govern the President's authority to respond to new emergencies.

## II

The Court rejects this narrow interpretation in favor of one that loses all sight of the general legislative purpose of the IEEPA and the clear legislative intent behind the grandfather clause. To achieve its labored result, the Court invokes a series of platitudes on statutory interpretation, but ignores their application to this case. Ironically, the very pieces of legislative history that the Court cites to justify its result clearly support the contrary view.

Recognizing the clear import of the legislative history, the Court begins by discovering absolute clarity in the "plain language" of the statute. The Court focuses on the fact that Congress used the term "authorities" in the grandfather clause instead of either the word "restrictions" or "prohibitions." Finding what, in its view, is a vast difference between the meaning of the first term and that of the latter two, the Court concludes that if Congress had meant "restrictions" it would have said so explicitly. *Ante*, at 236.

But the Court's confident claim that the statutory language is without ambiguity is pure *ipse dixit*. The Court concedes that throughout the legislative history Congress referred to what it wanted to grandfather as "restrictions," "controls," "specific uses," "prohibitions," "existing uses," and "authorities." It is true that Congress used the word "authorities" when it drafted the statute, but there is nothing to indicate

that it used the term "authorities" to express any intent other than that which is made plain in the legislative history. The likely reason that the term "authorities" was used instead of a term such as "prohibitions" is simply that § 5(b) authorized a President to do much more than issue prohibitions, and Congress intended to grandfather the uses of those powers as well.  For example, § 5(b) authorizes the President to conduct investigations of various activities and to "freeze" the assets of foreign countries and foreign nationals.  At the time Congress enacted the IEEPA, the President had exercised these authorities over several countries, including Cuba, and Congress clearly intended to grandfather those exercises.  Because the exercise of these powers does not fit naturally within a word such as "prohibitions," it is hardly surprising that Congress did not use that term. Thus, the short answer to the Court's question as to why Congress did not use the term "prohibitions" is simply that Congress intended to include more than mere prohibitions.

There is nothing in the language of the statute to suggest, however, that Congress intended the grandfather clause to provide a President with the authority to increase the restrictions applicable to a particular country without following the IEEPA procedures.  As the legislative history makes clear, when Congress grandfathered all "authorities . . . being exercised," it sought to preserve the uses of § 5(b) authorities that the President had employed in the past to address a particular situation—but no more.  As Representative Bingham, a principal drafter of the bill, stated: "if the President has not up to now used some authority that he has under section 5(b) in connection with those cases where 5(b) has been applied, I don't know why it should be necessary to give him authority to expand what has already been done." Subcommittee Hearings, at 167.

In its effort to downplay the clear legislative history of the grandfather clause, the Court relies on platitudes about the hazards of relying on such legislative history.  The Court correctly states:

"Oral testimony of witnesses and individual Congress-men, unless very precisely directed to the intended meaning of particular words in a statute, can seldom be expected to be as precise as the enacted language itself. To permit what we regard as clear statutory language to be materially altered by such colloquies, which often take place before the bill has achieved its final form, would open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on by Congress and signed into law by the President." *Ante,* at 237.

I have no disagreement with these generalities; they simply have no relevance to this case. The "colloquies" referred to involve the drafters of the Act, are directed at the precise language of the grandfather clause, and either were addressed to the bill in its final form, or aimed at getting changes in the bill to deal with precisely the problem at issue in this case.

Failing to heed its own advice, the Court then would rely on the legislative history of the Act to discern a congressional purpose consistent with its interpretation of the statute. The Court concludes that the purpose of the grandfather clause was to prevent the proposed bill from becoming controversial. Once again, I have no disagreement with this general interpretation. But the Court misapprehends the aspects of the statute that Congress feared would be divisive. Congress concluded that it would be controversial for it to examine existing controls to determine whether they were justified by the exigencies of particular situations. H. R. Rep. No. 95–459, at 9–10. And Congress also felt it undesirable to force the President either to declare new na-tional emergencies where none existed or to end restrictions without obtaining a *quid pro quo.* Accordingly, Congress decided that it would grandfather what the President already had done with respect to particular situations. The "contro-versy" that Congress hoped the grandfather clause would

258

avert had nothing to do with the President's authority to respond to future situations.

The Court displays its utter confusion about this matter through its reliance on a quotation from the House Report that the Court believes supports its broad interpretation of the grandfather clause. In fact, the passage provides strong support for exactly the interpretation that the Court rejects. The passage reads:

> "Certain *current* uses of the authorities affected by H. R. 7738 are controversial—particularly the total U. S. trade embargoes of Cuba and Vietnam. The committee considered carefully whether to revise, or encourage the President to revise, such existing uses of international economic transaction controls, and thereby the policies they reflect, in this legislation. *The committee decided that to revise current uses, and to improve policies and procedures that will govern future uses, in a single bill would be difficult and divisive.* Committee members concluded that *improved procedures for future use of emergency international economic powers should take precedence over changing existing uses.* By 'grandfathering' existing uses of these powers, without either endorsing or disclaiming them, H. R. 7738 adheres to the committee's decision *to try to assure improved future uses rather than remedy possible past abuses.*" H. R. Rep. No. 95–459, at 9–10 (emphases added).

The Court's decision to quote this language, *ante*, at 239–240, is remarkable. By its terms, the quotation makes clear that the controversy Congress sought to avoid was that which would arise if Congress passed judgment on "existing uses of international economic transaction controls, and thereby the policies they reflect." Accordingly, Congress grandfathered them. It is also clear that the "existing uses" and "economic controls" and "policies" that Congress decided

not to review included only "what has been done to date." Subcommittee Hearings, at 167 (remarks of Rep. Bingham). Congress had no hesitation about restricting the President's authority to exercise the emergency powers that he possessed but had not yet exercised. To the contrary, as the quotation on which the Court mistakenly relies makes absolutely clear, the primary purpose of the Act was to curtail "future uses" of precisely that residual authority.

Thus, it is equally remarkable for the Court to suggest that the purpose of the grandfather clause is to protect the President's authority to "respon[d] to heightened tensions with Cuba." *Ante,* at 240. If one thing is apparent from the legislative history of the Act, it is that Congress was not persuaded that the realities of the situation in Cuba constituted an emergency. See *supra,* at 247–249, 254–255. It is therefore somewhat incongruous to conclude that Congress intended to give the President greater flexibility to respond to developments in relations with Cuba than to events in other trouble spots around the world, such as Afghanistan, the Middle East, and Poland. With respect to future developments in such places, the IEEPA makes clear that the President cannot use his emergency powers to respond to "heightened tensions" unless the President has decided that a state of emergency exists, and has so declared. Nothing in the Court's opinion explains why Congress intended such unevenness in the President's authority to respond to future events; and it certainly is not self-evident why a less anomalous approach would have been "controversial."[6]

---

[6] Even the manner in which Congress discussed the need for avoiding controversy on substantive issues suggests that Congress had no idea that the grandfather clause would be read in the manner in which the Court has interpreted it. Representative Bingham explained the reason for the grandfather clause:

"We have also in title I grandfathered in essentially those actions taken under the [TWEA] which it would be extremely difficult, if not impossible,

The full incongruity of the Court's unsupported conclusion that Congress inserted the grandfather clause to preserve the President's "flexibility to adjust existing embargoes," *ante,* at 236, is perhaps even more apparent with respect to trade relations with China. In 1950, trade with China was halted by a general prohibition on unlicensed property transactions similar to the general prohibition on trade with Cuba. Compare 31 CFR § 500.201(b) (1977) (China) with 31 CFR § 515.201(b) (1977) (Cuba). In 1971, however, the President nullified this general prohibition by enacting an equally broad general license. 36 Fed. Reg. 8584. In detailing the exercises of authority under § 5(b) in effect at the time of the IEEPA, the House Report chronicled the history of trade restrictions with China as follows:

> "On May 8, 1971, the Department licensed most subsequent transactions with China, while continuing the blocking of Chinese assets in U. S. hands before that date. *This had the effect of lifting the U. S. trade embargo of China.* However, the embargoes of North Korea, Vietnam, Cambodia, and Cuba continue." H. R. Rep. No. 95–459, at 6 (emphasis added).

---

to persuade the Congress to reverse at this time. I refer to the embargo against Cuba, the embargo against Vietnam and so on.

> "I think for us to attempt to deal with those controversial substantive issues would be a mistake even though I personally favor lifting the embargo against Cuba and Vietnam." House Markup, at 2.

Obviously, Representative Bingham viewed grandfathering as an alternative to reviewing the regulations then currently in effect under § 5(b) and deciding which restrictions to lift. See also H. R. Rep. No. 95–459, at 11; Subcommittee Hearings, at 210 (remarks of Rep. Findley) (arguing that Congress should not grandfather and thereby give administration "easy way" to avoid resuming normal trade relations with other countries); *id.,* at 193 (statement of Rep. Bingham) (question of whether or not to grandfather is question of whether or not to "disturb" existing embargoes); *id.,* at 7–8 (statement of Rep. Bingham); see also House Markup, at 10 (remarks of Rep. Whalen) (grandfather clause gives President discretion to continue any *controls* currently in effect).

No other reference to extant trade embargoes refers to a trade embargo against China. See, *e. g.*, Subcommittee Hearings, at 108 (statement of Assistant Treasury Secretary Bergsten); House Markup, at 8 (statement of Rep. Bingham). Thus, in the eyes of Congress, the President was no longer exercising § 5(b) authorities with respect to trade with China even though a nullified general prohibition was still in effect. Congress presumably envisioned that the grandfather clause would preserve the freeze on Chinese assets, but that all subsequent controls on trade would be subject to the new IEEPA procedures.

The incongruity in the Court's analysis arises because the President's position in 1977 with respect to all trade with China was exactly like his position with respect to travel-related expenditures in Cuba. If the logic of the Court's opinion in this case is correct, Congress intended the grandfather clause in the IEEPA to preserve the President's authority to reinstitute a complete trade embargo with China simply by eliminating the general license that was in effect at the time that the IEEPA was passed.[7] There is no question that the Congress that enacted the IEEPA did not imagine that the grandfather clause preserved the President's authority to transform trade relations with another country from a situation of virtually free trade to a situation of complete embargo without following the IEEPA procedures. To use the Court's words, *ante*, at 235, it "does undue violence to the words chosen by Congress," to say nothing of congressional

---

[7] The petitioners attempt to discount this incongruity by arguing that the issue of whether the President could have reinstituted the Chinese embargo under the grandfather clause is "moot," since the President ended the use of § 5(b) authorities against China in 1980. See Reply Brief for Petitioners 15, n. 18. While it may be true that the President cannot now resurrect embargo powers under the grandfather clause with respect to China because he has allowed all § 5(b) authorities used against China to lapse, under the Court's analysis, the President would have been free to place a full embargo on China without complying with the IEEPA until such time as he allowed those powers to expire.

intent, to suggest that Congress considered the reimposition of a complete prohibition on trade with China as an "existing exercise" of § 5(b) authorities preserved by the grandfather clause. Surely, the reimposition of a complete embargo fits squarely within the "future uses" of emergency authorities to which Congress contemplated the new IEEPA procedures would apply. The situation presented in this case with respect to Cuba is no different, and it is equally clear that an increase in the embargo of Cuba is what Congress considered to be a "future use" of emergency authority not protected by the grandfather clause.

### III

Because the restrictions on travel-related expenditures in Cuba were not promulgated in conformity with the IEEPA and because there is no coherent reason to believe that Congress intended to preserve the President's authority to institute such restrictions without complying with the IEEPA, I respectfully dissent.

JUSTICE POWELL, dissenting.

As the petitioners argue, the judgment of the Court may well be in the best interest of the United States. The regulations upheld today limit Cuba's ability to acquire hard currency, currency that the Executive has found might be used to support violence and terrorism. Our role is limited, however, to ascertaining and sustaining the intent of Congress. It is the responsibility of the President and Congress to determine the course of the Nation's foreign affairs. In this case, the legislative history canvassed by JUSTICE BLACKMUN's dissenting opinion unmistakably demonstrates that Congress intended to bar the President from expanding the exercise of emergency authority under § 5(b). Contrary to the Court's view, the meaning of the word "authorities" in the grandfather clause is not "clear," see ante, at 237, nor in my view is it contrary to the fair import of this history.