## HAVANA CLUB HOLDING, S.A. and Havana Club International, S.A., Plaintiffs,

v.

## GALLEON S.A., Bacardi–Martini USA, Inc., Gallo Wine Distributors, Inc., G.W.D. Holdings, Inc. and Premier Wine and Spirits, Defendants.

### No. 96 CIV. 9655(SAS).

United States District Court, S.D. New York.

Aug. 12, 1997.

Michael Krinsky, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, Charles Sims, Proskauer, Rose, LLP, New York City, for Plaintiffs.

William R. Golden, Jr., Margaret E. Ferguson, Kelley, Drye & Warren, LLP, New York City, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, District Judge:

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on their counterclaim for cancellation of the "Havana Club" trademark and design registration in the United States Patent and Trademark Office ("PTO"). Defendants first contend that Plaintiffs' attempt to secure their rights to the mark without approval of the Office of Foreign Assets Control ("OFAC") stripped Plaintiffs of any rights to the mark and thus caused the mark to be abandoned. In opposition, Plaintiffs contend that their acquisition of rights to the mark was valid under the Cuban Assets Control Regulations ("CACR"), as well as the General Inter–American Convention for Trade Mark and Commercial Protection ("Inter–American Convention"). Plaintiffs claim, in the alternative, that there was no requirement that OFAC approve the assignment. Defendants additionally seek cancellation of Plaintiffs' registration of the mark based on the theory that Plaintiffs have no right to use the mark.

Plaintiffs move to amend their complaint to include two additional causes of action against Defendants. Plaintiffs also move to dismiss certain counterclaims raised by Defendants. For the reasons set forth below, Defendants' motion is granted, in part, and denied, in part. Plaintiffs' motion to amend their complaint is granted, in part, and denied, in part. Plaintiffs' motion to dismiss certain of Defendants' counterclaims is denied without prejudice.

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

A party is entitled to summary judgment when there is "no genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of demonstrating the absence of a material factual dispute rests on the moving party. *See Gallo v. Prudential Residential Svcs., Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994). Once that burden is met, the non-moving party must present "significant probative supporting evidence" that a factual dispute exists. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

The court's role is not to try issues of fact, but rather to determine whether issues exist to be tried. *See Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir. 1989); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). All ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–

14; *Donahue,* 834 F.2d at 57, 60. If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

### B. Factual Background

#### 1. The Cuban Assets Control Regulations

The CACR were implemented in 1963 under Section 5(b) of the Trading with the Enemy Act of 1917 ("TWEA"), as amended, 50 U.S.C.App. 1–44. Section 5(b) of the Act affords the President "broad authority to impose comprehensive embargoes on foreign countries as one means of dealing with both peacetime emergencies and times of war." *Regan v. Wald,* 468 U.S. 222, 225–26, 104 S.Ct. 3026, 3029, 82 L.Ed.2d 171 (1984). The CACR, one such embargo, were adopted in response to Cuban efforts to destabilize Latin American governments. *Id.* at 226, 104 S.Ct. at 3029–30 (citing Presidential Proclamation No. 3447, 3 C.F.R. § 157 (1959–1963 Comp.)).

The President had delegated his powers under the TWEA to the Secretary of the Treasury in 1942. In 1962, the Secretary delegated the administration of foreign assets control regulation to OFAC. *See Sardino v. Federal Reserve Bank of New York,* 361 F.2d 106, 109 n. 2 (2d Cir.1966). OFAC remains responsible for executing and enforcing economic embargoes and sanctions programs against several countries. *See Free Trade with Cuba Act, Hearings on H.R. 2229 Before the Subcomms. on Select Revenue Measures and Trade of the House Comm. on Ways and Means,* 103rd Congress 99 (1994) (statement of R. Richard Newcomb, Director of OFAC). In that capacity, OFAC administers the embargo against Cuba pursuant to the CACR.

The CACR prohibit transfers of property, including trademarks, in which a Cuban entity has an interest, except when specifically authorized by the Secretary of the Treasury. *See* 31 C.F.R. §§ 515.201(b), 515.311. OFAC, acting on behalf of the President, enjoys considerable discretion to authorize otherwise prohibited transactions by way of licenses. *See id.* § 515.801(b)(6). Moreover, OFAC has the same discretion to amend, modify or revoke both the licensing provisions of the CACR, as well as individual licenses, at any time. *Id.* § 515.805.

#### 2. The Current Controversy

Havana Club rum, produced in Cuba and distributed under the Havana Club trademark, has been exported to over twenty countries since 1973. *See* Declaration of Luis Francisco Perdomo Hernandez ("Perdomo Decl."), Vice Chairman of the Board of Havana Club Holding, S.A., dated June 6, 1997, ¶ 5. According to Plaintiffs, the sole reason Havana Club rum is not currently sold in this country is that the embargo prohibits its importation, except as accompanying baggage of a returning United States visitor to Cuba. *See* 31 C.F.R. § 515.560(c)(3); Complaint ¶ 27. Plaintiffs assert that since 1973, the owners of Havana Club rum have intended to sell their rum in the United States as soon as it is legally possible to do so. Complaint ¶ 27. At present, the principal markets for Havana Club rum are Western Europe, Canada, and Mexico, although Havana Club is also sold in Central and South America, and in other markets. *Id.* at ¶ 25.

Under Section 44 of the Lanham Act, foreign entities are permitted to register trademarks in the United States. 15 U.S.C. § 1126. Pursuant to Section 44, the Havana Club mark was registered in the United States in 1976 by Cubaexport, a Cuban state enterprise, based on Cubaexport's registration of the mark in Cuba. Complaint ¶ 17; 15 U.S.C. § 1126(c). Cubaexport continued to market Havana Club rum internationally from 1972 until 1993. Perdomo Decl. ¶ 5.

In 1993, Cubaexport's Havana Club rum business was reorganized to incorporate a foreign partner. *See* Perdomo Decl. ¶ 11. Cubaexport reached an agreement with Pernod Richard, S.A. ("Pernod"), an international distributor of liquor, to form two companies: (1) Havana Club Holding ("HC Holding"), of which 50% equity and board representation was to be held by a newly formed Cuban company, Havana Rum & Liquors, S.A., and 50% by Pernod; and (2)

Havana Club International ("HCI"), which has a 50–50 equity split between Havana Rum & Liquors and Pernod, both through direct holdings and through holdings in HC Holding. *See* Perdomo Dec. ¶ 12. Plaintiffs allege that all of the assets associated with the Havana Club trademark were transferred as part of this reorganization by Cubaexport to Havana Rum & Liquors, which then transferred them to HC Holding. *Id.* HC Holding then granted HCI an exclusive license to sell Havana Club rum and to use the Havana Club trademark. *Id.* The transfer of the trademark in the 1993 reorganization of Cubaexport's Havana Club business was governed by the CACR.

On October 5, 1995, Plaintiffs applied to OFAC for a specific license [1] authorizing the assignment of the Havana Club trademark, Registration No. 1,031,651, from Cubaexport to Havana Rum & Liquors, S.A. to Havana Club Holdings, S.A. *See* Affidavit of Margaret Ferguson ("Ferg.Aff."), attorney for Defendants, May 23, 1997, Ex. E. On November 13, 1995, OFAC issued License No. C–18147, which approved the assignment and authorized all necessary transactions incident to the assignment of the mark. *Id.* However, on April 17, 1997, OFAC issued a Notice of Revocation stating that "as a result of facts and circumstances that have come to the attention of this Office which were not included in the application of October 5, 1995, License No. C–18147 .... is hereby revoked retroactive to the date of issuance." *Id.*, Ex. G. OFAC did not further explain the grounds for the revocation but did state that any action taken under the license is null and void as to matters under its jurisdiction. *See id.*

■ OFAC enjoys considerable discretion in granting or revoking licenses, and the CACR permit OFAC to amend, modify, or revoke a license at any time, on its own initiative. *See Havana Club Holding, S.A. v. Galleon S.A.*, 961 F.Supp. 498, 505 (S.D.N.Y. 1997). Moreover, the CACR grant OFAC the authority to take such action *sua sponte.* *Id.* Because the issuance or revocation of licenses by OFAC is committed to OFAC's discretion, OFAC's decisions are not reviewable by this Court. *Id.* at 503, 505. Consequently, Defendants contend that because Plaintiffs have failed to obtain a specific license and are unable to challenge OFAC's decision, Plaintiffs cannot validly transfer the United States registration of the Havana Club mark. *See* Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment ("Def.Mem.") at 8.

Plaintiffs advance four arguments in response to Defendants' assertion: (1) the general license for United States intellectual property, provided for in the CACR, permitted the assignment of the mark, *see* 31 C.F.R. § 515.527(a); (2) the Inter–American Convention requires this Court to construe the general license to authorize the assignment of the mark; (3) the Fifth Amendment of the Constitution similarly requires that the general license is sufficient to authorize the assignment; and, in the alternative, (4) the Havana Club mark is not covered by the TWEA and CACR. Each of these arguments is offered to support Plaintiffs' contention that Cubaexport effectively transferred the rights to the mark to Plaintiffs. I turn now to each of these arguments.

### C. Discussion

#### 1. Plaintiffs' Application Under the CACR

■ Plaintiffs argue that although they applied for a specific license to transfer the trademark, the general license provided in the CACR is sufficient for this purpose. *See* Plaintiffs' Memorandum of Law in Opposition to Motion for Partial Summary Judgment ("Pl.Mem.") at 4. The CACR creates both general licenses, which permit classes or categories of transactions with Cuban nationals, *See, e.g.,* 31 C.F.R. § 515.542 (authorizing "[a]ll transactions of common carriers incident to the receipt of mail between the United States and Cuba"), and specific licenses, which require individualized determinations and approval by OFAC. *See id.* § 515.801. A general license, furthermore, "is any license or authorization the terms of which are set

---

1. For an explanation of the difference between a specific license and a general license see pp. 306–307 *infra.*

forth [in the CACR]." 31 C.F.R. § 515.318. The general license pertaining to United States intellectual property authorizes "[t]ransactions related to the *registration and renewal* in the United States Patent and Trademark Office or the United States Copyright Office of patents, trademarks, and copyrights in which the Government of Cuba or a Cuban national has an interest...." 31 C.F.R. § 515.527(a) (emphasis added).

By the express terms set forth in this section, the general license allows for the registration and renewal of trademarks. It does not, however, address the question of whether a registration may be assigned to an individual or corporation. Because the terms of the general license do not contain express authorization for the transfer of rights to trademarks, an individual or company seeking to assign a trademark is therefore required to obtain a specific license. A specific license "is any license or authorization issued pursuant to [the CACR] but not set forth in [the CACR]." 31 C.F.R. § 515.318.

Here, the participation of Cuban entities in a transaction involving United States property triggers the CACR. The particular transaction at issue—the assignment of the United States trademark—is not expressly permitted by the general license governing intellectual property. Thus, because Plaintiffs seek to engage in a transaction covered by the CACR but not expressly permitted therein, Plaintiffs' transfer of the mark is only permitted by OFAC's issuance of a specific license.

Moreover, on December 19, 1996, the Director of OFAC, R. Richard Newcomb, informed Defendants' counsel that the

> general license allows only for the registration and renewal of intellectual property; § 515.527 does not convey to the registrant the authority to assign the registrant's interest in a patent, trademark or copyright

registered in the United States to another person. Such an assignment would require authorization by OFAC in the form of a specific license.

Ferg. Aff., Ex. F.[2] Because Congress has not "directly spoken to the precise question at issue," the court must sustain the Director's interpretation so long as it is "based on a permissible construction of the statute." *Auer v. Robbins,* —— U.S. ——, ——, 117 S.Ct. 905, 909, 137 L.Ed.2d 79 (1997) (quoting *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). The Supreme Court has long recognized "that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. at 844, 104 S.Ct. at 2782.

Both the express terms of the general license and my analysis of the relevant CACR provisions compel the conclusion that OFAC has properly construed the statute to preclude a transfer under the general license. Accordingly, a specific license was required for the assignment of the Havana Club trademark. Plaintiffs' use of the general license was insufficient for this purpose.[3]

### 2. The Inter–American Convention

Plaintiffs next argue that the Inter–American Convention requires that the general license be construed to permit the assignment of trademarks. The Inter–American Convention, a multi-lateral regional trademark treaty between the United States and several Latin American nations, compels signatory nations to grant to the nationals of other signatory nations the same rights and remedies which their laws extend to their own nationals. *See* Inter–American Convention, ch. I, art. 1, 46 Stat. at 2912. The United States and Cuba are both signatory

**2.** Although Newcomb's interpretation is found in an affidavit from Defendants' counsel, the form of Newcomb's comments does not render them unreliable. The communication is consistent with statements OFAC has made to Plaintiffs. There is no reason to suspect that the interpretation made by OFAC does not reflect the agency's fair and considered judgment on the matter. *See Auer v. Robbins,* —— U.S. ——, ——, 117 S.Ct. 905, 912, 137 L.Ed.2d 79 (1997) (finding that the

court may rely upon an interpretation of a federal statute by the Secretary of Labor in an amicus brief).

**3.** Plaintiffs own October 19, 1995 application to OFAC to obtain a specific license suggests that, prior to OFAC's revocation, Plaintiffs would have agreed with this conclusion.

nations to the Convention. *Treaties In Force: A List of Treaties and Other International Agreements of the United States In Force on January 1, 1996,* 373 (June 1996).

Article 11 of the Inter–American Convention provides that

the transfer of the ownership of a registered or deposited mark in the country of its original registration shall be effective and shall be recognized in the other Contracting States, provided that reliable proof be furnished that such transfer has been executed and registered in accordance with the internal law of the State in which such transfer took place. Such transfer shall be recorded in accordance with the legislation of the country in which it is to be effective.

Inter–American Convention, ch. II, art. 11, 46 Stat. at 2922–2924. In the spirit of according reciprocal rights between signatory nations, Article 11 binds the United States and all other member nations [4] to give effect to and record upon its registry a valid transfer of a trademark that has occurred in another member nation. Accordingly, Plaintiffs argue, the transfer of a trademark in Cuba has the effect of transferring the trademark in the United States, and the United States is obligated to record this transfer on its registry. *See* Pl. Mem. at 6.

■ Plaintiffs further argue that an irreconcilable conflict between the CACR and the Inter–American Convention arises if the general license does not allow for the transfer in the United States of a transfer that was valid in Cuba. Plaintiffs correctly invoke the principle that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 178 n. 35, 113 S.Ct. 2549, 2562 n. 35, 125 L.Ed.2d 128 (1993) (quoting *Murray v. The Charming Betsy,* 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804)). *See* Pl. Mem. at 6. However, construing the Inter–American Convention as Plaintiffs suggest would circumvent the CACR's provisions regarding general and specific licenses and OFAC's

unreviewable interpretation of the CACR. The issue then is whether the CACR supersedes the Inter–American Convention.

Under our constitutional system, statutes and treaties are both the supreme law of the land, and the Constitution establishes no order of precedence between them. U.S. Const. art. VI, cl. 2. The Supreme Court has "repeatedly taken the position that an Act of Congress, which must comply with the Constitution, is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null." *Reid v. Covert,* 354 U.S. 1, 18, 77 S.Ct. 1222, 1231, 1 L.Ed.2d 1148 (1957). The classic enunciation of the principle governing conflicting treaties and statutes is that in *Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888):

By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always give effect to both, if that can be done without violating the language of either; but if the two are inconsistent, the one last in date will control the other . . . .

*See also Blanco v. United States,* 775 F.2d 53, 61 (2d Cir.1985) (quoting *Whitney* in a discussion of the conflicting Public Vessels Act of 1925 and the 1928 Honduras Act). Although repeals by implication are not favored, the Supreme Court has articulated two well-settled categories of implied repeals:

(1) Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act.

---

**4.** The signatory nations to the Inter–American Convention are Columbia, Cuba, Guatemala, Haiti, Honduras, Nicaragua, Panama, Paraguay, Peru, and the United States. *Treaties in Force,* 373, 1996.

*Posadas v. National City Bank of New York,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936). In either case, the intention of the legislature must be clear and manifest; otherwise, the later act is to be construed as a continuation of, and not a substitute for, the first act. *See id.*

■ The CACR, enacted in 1963, were issued 32 years after the ratification of the 1931 Inter–American Convention. Moreover, they were meant to be temporary. Thus, construing the CACR presents a unique scenario. The CACR were issued by President Kennedy, pursuant to § 5(b) of the TWEA. As a result, there is no legislative history. The Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 ("Cuban Liberty Act"), 22 U.S.C. §§ 6021–6091, in which the CACR are now codified, declares that it is United States policy "[t]o take steps to remove the economic embargo of Cuba when the President determines that a transition to a democratic elected government in Cuba has begun."[5] 22 U.S.C. § 6061(14). The Cuban Liberty Act, moreover, was enacted 65 years after the Inter–American Convention.

Both OFAC's construction of the CACR and their temporary nature lead to the conclusion that the CACR are not to be understood "as a continuation of" the Inter–American Convention. OFAC's determination that the general license does not allow for the transfer of the trademark, which would be permitted under the Inter–American Convention, strongly suggests that the CACR constitutes an implied repeal of this earlier convention. The CACR appear to be a temporary substitute for the Inter–American Convention, among other treaties and conventions.[6] Once the CACR are lifted, transactions pursuant to the Inter–American Convention and other treaties will be recognized once again.

The passage in 1996 of the Cuban Liberty Act also supports this conclusion. One purpose of the Act is to "strengthen international sanctions against the Castro government." 22 U.S.C. § 6022(2). The Act also states that the President shall instruct the Secretary of the Treasury and Attorney General to fully enforce the provisions of the CACR. 22 U.S.C. § 6032(c). Moreover, it is the policy of the United States, upon the President's determination that a democratically elected government exists in Cuba, to "support the reintegration of the Cuban Government into Inter–American organizations ...." 22 U.S.C. § 6061(13).

Plaintiffs' argument runs counter to the underlying policies of the CACR. The interests advanced by the CACR are (1) to limit funds which Cuba may use to promote activities that may be harmful to the United States; (2) to use blocked funds for leverage for negotiations with the Cuban Government; and (3) to retain control over blocked funds for possible use or vesting in settlement of American claims. *See De Cuellar v. Brady,* 881 F.2d 1561, 1569 (11th Cir.1989); *Capital Cities/ABC, Inc. v. Brady,* 740 F.Supp. 1007, 1013 n. 13 (S.D.N.Y.1990); *see also Cheng Yih–Chun v. Federal Reserve Bank of New York,* 442 F.2d 460, 465 (2d Cir.1971). The inclusion of Pernod as a partner in the reorganization of Havana Rum & Liquors allowed hard currency to flow into Cuba. *See* Reply Affidavit of Margaret Ferguson ("Reply Ferg. Aff."), June 16, 1997, Ex. D. (Perdomo's deposition describes Pernod's payment of an unspecified price to Havana Rum & Liquors in exchange for the mark). Although the facts are not entirely clear, Pernod engaged in a transaction with Havana Rum & Liquors in order to gain a 50% percent interest in both HC Holding, the intended assignee of the trademark, and HCI, the intended licensee of the mark. Such a transaction, in which Pernod exchanged currency for rights to the mark,

---

5. 22 U.S.C. § 6065 states the conditions constituting "a transition government in Cuba," which include, for example, the legalization of all political activity, 22 U.S.C. § 6065(a)(1); and a public commitment to the organization of free and fair elections for a new government, 22 U.S.C. § 6065(a)(3).

6. The Paris Convention, as well as the Agreement on Trade–Related Aspects of Intellectual Property Rights, incorporated in the Uruguay Round Agreement Act, may have also allowed for the transfer of the registration in the absence of the CACR.

flies in the face of the CACR's aim to limit the flow of funds into Cuba.[7]

As a result, Article 11 of the Inter–American Convention cannot survive the CACR or provide a means of transferring the registration.

### 3. Due Process

Plaintiffs argue that under the due process standards applicable to the CACR, the distinction between an assignment and a new registration would neither be "the product of a deliberate and rational choice" nor "have a reasonable basis." *See* Pl. Mem. at 7 (quoting *Richardson v. Simon,* 560 F.2d 500, 505 (2d Cir.1977)). "[D]ue process requires that government officials refrain from acting in an irrational, arbitrary or capricious manner." *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985). Plaintiffs, however, fail to consider the basic principles of the CACR. As noted above, the CACR are designed, in part, to prevent the flow of hard currency into Cuba which may be used to promote activities adverse to the interests of the United States. *Capital Cities/ABC, Inc. v. Brady,* 740 F.Supp. at 1013 n. 13. The registration or renewal of a trademark, as authorized by the general license, will generally not promote the flow of funds into Cuba. In such a transaction, an individual or corporation simply seeks to gain protection or renew protection of a trademark. However, the transfer of a registration creates the opportunity for an individual or corporation to purchase the registration from a Cuban entity, thereby allowing hard currency to enter Cuba. The effort to thwart the flow of funds into Cuba provides a rational basis for OFACs distinction between registrations and assignments.

### 4. The Scope of "Property" Under the CACR

Finally, Plaintiffs contend that no OFAC license, general or specific, was needed to transfer the mark because the registration is not property within the scope of the

TWEA or the CACR. *See* Pl. Mem. at 11. The CACR covers,

[a]ll dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States.

31 C.F.R. § 515.201(b)(1). Section 515.311 provides that the terms "property" and "property interest" or "property interests" shall include "trademarks." *See* 31 C.F.R. § 515.311. Plaintiffs contend that the federal registration does not create the trademark right; it only recognizes the right acquired through use. *See* Pl. Mem. at 8 (quoting *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1270, n. 5 (2d Cir.1974)). Plaintiffs note that neither HC Holding nor its predecessors have used the trademark within the United States, *see* Pl. Mem. at 8. Thus, Plaintiffs argue, the trademark has never become common law property nor are there any common law rights in it. *Id.*

Plaintiffs acknowledge that their registration of the mark evidences alleged rights in the future use of the mark. *See* Pl. Mem. at 10 ("... an intended future use may confer rights evidenced by a registration."). The CACR unambiguously prohibits all transfers of "evidences of ownership of property by any person subject to the jurisdiction of the United States." 31 C.F.R. § 515.201(b)(1). This section includes the registration of trademarks and prohibits any transaction in which Cuban nationals "at any time ... had any interest of any nature whatsoever, direct or indirect" in the property involved. *Id.* Plaintiffs' registration of the Havana Club trademark is not only evidence of alleged rights in the mark, but must also be considered "any interest of any nature whatsoever, direct or indirect" in the Havana Club trademark.

---

7. Although OFAC failed to elaborate on its decision to revoke Plaintiffs' specific license, the "facts and circumstances" which later came to the attention of OFAC apparently concerned the incorporation of Pernod into the ownership of HC Holding and HCI. Plaintiffs' October 19, 1995 application, filed by Plaintiffs' counsel, stated that "each of the assignors and assignees are nationals of Cuba." Plaintiffs' own papers indicate that Pernod, one of the parties involved in the reorganization, is not a national of Cuba. *See* Perdomo Dec. ¶ 11 (noting that Pernod is a "French liquor distributor").

Plaintiffs have also satisfied the jurisdictional requirement of § 515.201(b)(1). The Lanham Act compels foreign registrants such as Plaintiffs to designate an agent subject to the jurisdiction of the United States. The Act provides that "if the applicant is not domiciled in the United States he shall designate ... the name and address of some person resident in the United States on whom may be served notices or process in proceedings affecting the mark." 15 U.S.C. § 1051(e). Plaintiff HC Holding designated H. John Campaign, Keith E. Danish and John M. Keene, of Graham, Campaign & McCarthy P.C., in New York, New York for service of notices or process. *See* Reply. Ferg Aff., Ex. B.

Therefore, in reliance on Plaintiffs' concession that the registration indicates rights to the use of the mark and Plaintiffs' designation of an agent subject to United States jurisdiction, Plaintiffs' attempted transfer of the Havana Club registration fell under the provisions of § 515.201(b)(1) and thus within the scope of the CACR. Plaintiffs' only claim to ownership of the mark is by assignment. Accordingly, Plaintiffs have no rights to the Havana Club trademark.

### 5. Cancellation of the Mark

 Defendants next seek cancellation of the registration because of Plaintiffs' inability to claim rights to the mark. Cancelling the registration under these circumstances, however, would lead to an inequitable adjudication of the matter and neglect the substantial rights of Cubaexport, a party not before this court.

 Cubaexport's rights arise out of the invalid transfer of the rights to the mark. The abortive transfer between Cubaexport, Havana Rum & Liquors, and Plaintiffs voids those provisions of the contract relating to the mark, rendering them invalid and of no effect. Cubaexport, Havana Rum & Liquors, and Plaintiffs, as the original parties to the transaction, are returned to the *status quo*

*ante.*[8] Cubaexport, restored as the owner of the registration, inevitably has an interest in the outcome of the registration issue. Thus, Cubaexport is a necessary party to this action.

 Plaintiffs cannot assert Cubaexport's rights due to the well-established prohibition on jus tertii defenses in trademark cases. *See Marshak v. Sheppard,* 666 F.Supp. 590, 599 (S.D.N.Y.1987) ("jus tertii should not be allowed as a defense in any trademark case"). However, when a court believes that an absentee may be needed for a just adjudication, it may raise compulsory party joinder on its own motion. *See, e.g., Gonzalez v. Cruz,* 926 F.2d 1, 5 n. 6 (1st Cir.1991); 4 Richard R. Freer, *Moore's Federal Practice,* § 19.02[4][a] (3d ed.1997).

Federal Rule of Civil Procedure 19 provides the legal standards for the joinder of necessary parties. Rule 19(a) states, in relevant part that

> [A] person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if ... the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... as a practical matter impair or impede the persons's ability to protect that interest.

*See* Fed.R.Civ.P. 19. Here, Cubaexport is subject to service of process by service on its United States representative. Joining Cubaexport as a party will not affect this Court's jurisdiction.

> [S]everal courts have ruled that "the concept of indispensability does not concern the Court's subject matter jurisdiction as much as it deals with the ability or right of the Court to make an adjudication[:] The major question is whether the court can render a decision which will not impair the rights of the absent party."

8. Cubaexport registered the mark with the PTO on January 27, 1976 pursuant to 31 C.F.R. § 515.527. *See* Declaration of Caroline Rule (attorney for Plaintiffs) in support of Motion for Preliminary Injunction, dated December 30, 1996, Ex. B, incorporated by reference in Perdo-

mo Decl. ¶ 6. Cubaexport transferred the mark to Havana Rum & Liquors on October 29, 1993, who transferred the mark to Plaintiff HC Holding on November 23, 1993. HC Holding proceeded to register it on January 12, 1996. *See* Perdomo Decl. ¶ 1 8, 12, 13, 21

*6247 Atlas Corporation v. Marine Insurance Co., Ltd.,* 155 F.R.D. 454, 459 (S.D.N.Y.1994) (quoting *Ente Nazionale Idrocarburi v. Prudential Sec. Group,* 744 F.Supp. 450, 456 (S.D.N.Y.1990)); *see also Lipton v. Nature Co.,* 781 F.Supp. 1032, 1034 (S.D.N.Y.1992) ("Rule 19 motion regarding indispensable parties . . . [is] addressed to the court's equitable discretion. Necessary and indispensable parties can only be determined in the context of the particular litigation; the inquiry must be a fact-based one.").

Cubaexport has a significant business interest in maintaining the registration of its mark. It may reform its agreement with Plaintiffs so that it is once again the company entitled to export the rum under the Havana Club mark after the embargo is lifted. Or, it may seek to renegotiate the assignment of the mark to Plaintiffs after Plaintiffs restructure their corporate organization to comply with the provisions of the CACR. Such opportunities would clearly be impaired if this Court granted Defendants' petition to cancel Cubaexport's registration. Accordingly, Defendants' petition to cancel the registration is denied, and all rights to the registration revert to Cubaexport. However, Plaintiffs rights to the registration are canceled.[9]

## II. PLAINTIFFS' MOTION TO AMEND THEIR COMPLAINT

### A. Factual Background

Plaintiffs filed their original complaint on December 24, 1996, seeking to enjoin Defendants from using the words "Havana Club" as part of any trademark, service mark, brand name, trade name or other business or commercial designation in connection with the sale, distribution, advertising or promotion of rum or rum products in the United States. Plaintiffs alleged that such use violates their respective rights under §§ 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114 and 1125 and have moved for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.

Plaintiffs now seek leave to file a First Amended Complaint to include two causes of action alleging violations of the Inter–American Convention and additional violations of the Lanham Act. In their third proposed claim for relief, Plaintiffs assert that Defendants used the Havana Club trademark in the United States notwithstanding their knowledge of the prior protection, existence and use of the trademark in other countries that are signatories to the Inter–American Convention, including Cuba. Plaintiffs allege such use violates Article 7 and Chapter IV of the Inter–American Convention and § 44(h) of the Lanham Act.[10] In their fourth proposed claim for relief, Plaintiffs assert Defendants used Havana Club as a trademark for rum in the United States notwithstanding that its distinguishing elements consist of a part of Plaintiffs' commercial names, which were previously used by them in Cuba. Plaintiffs allege such use violates Chapter III of the Inter–American Convention and §§ 44(g) and 44(h) of the Lanham Act, 15 U.S.C. §§ 1126(g) and 1126(h).

### B. Legal Standard

Pursuant to Federal Rule of Civil Procedure 15(a), leave to amend a complaint

---

9. Defendants additionally argue that the separation of the trademark from the appurtenant business, the hard assets in Cuba, resulted in an assignment in gross. *See* Def. Mem. at 15. As a general matter, Defendants are correct in asserting that such a situation may lead to an assignment in gross. However, the principle is inapplicable to the unique circumstances of this matter. Cubaexport and Plaintiffs never had assets in the United States. While the Havana Club trademark may be recognizable by U.S. consumers, the embargo has prevented Plaintiffs and Cubaexport from importing, distributing, selling, or maintaining any assets in this country. Thus, it was impossible for the Plaintiffs and Cubaexport to have separated the mark from the business assets when no assets existed in the United States.

10. Plaintiffs allege in the Preliminary Statement of their First Amended Complaint that Defendants violated Chapter IV of the Inter–American Convention. Plaintiffs, however, fail to assert this allegation in their statement of their third proposed cause of action. Plaintiffs only make passing reference in a footnote to two remedies supplied by Chapter IV in their Memorandum of Law in Support of Motion for Leave to Amend Complaint and fail to refer to Chapter IV in any sense their reply brief. Consequently, Plaintiffs may not amend to assert a claim based on Chapter IV.

is generally given freely. However, a court may exercise its discretion to deny leave in a number of circumstances. For example, prior to granting leave to amend, a court must examine a proposed claim to determine if it is futile on its face. *See Town of New Windsor v. Tesa Tuck, Inc.*, 919 F.Supp. 662, 678 (S.D.N.Y.1996); *Barrett v. U.S. Banknote Corp.*, 806 F.Supp. 1094, 1098 (S.D.N.Y.1992). If a claim would be futile, leave to amend should not be granted. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). An amendment is considered futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis. *See, e.g., S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Building 1 Housing Development Fund Co., Inc.*, 608 F.2d 28, 42 (2d Cir.1979); *Chan v. Reno*, 916 F.Supp. 1289, 1302 (S.D.N.Y.1996). In deciding a motion to dismiss, the moving party must demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The court must assume the truth of the allegations contained in the complaint and must construe all reasonable inferences in favor of the plaintiff. *See Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986).

### C. Discussion

#### 1. The Lanham Act and Inter–American Convention

Under § 44(b) of the Lanham Act, any person whose country of origin is a party to any trademark convention or treaty to which the United States is also a party

> shall be entitled to the benefits of this section under the conditions expressed herein to the extent necessary to give effect to any provision of such convention, treaty or reciprocal law, in addition to the rights to which any owner of a mark is otherwise entitled by this Act.

15 U.S.C. § 1126(b). Individuals or companies that meet the requirements of this section may also seek protection of trade names or commercial names "without the obligation of filing or registration whether or not they form parts of marks." 15 U.S.C. § 1126. Furthermore, such individuals or companies

> shall be entitled to protection against unfair competition, and the remedies provided herein for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition.

15 U.S.C. § 1126(h).

Plaintiffs assert that the Lanham Act incorporates and implements the provisions of the Inter–American Convention. Chapter 1, Article 1 of the Convention states, in relevant part, that

> [t]he Contracting States bind themselves to grant to the nationals of the other Contracting States and to domiciled foreigners who own a manufacturing or commercial establishment ... in any of the States which have ratified or adhered to the present Convention the same rights and remedies which their laws extend to their own nationals or domiciled persons with respect to trade marks, trade names and the repression of unfair competition....

Inter–American Convention, ch. I, art. 1, 46 Stat. at 2912. Chapter II, Article 7 further provides that the owner of a trademark protected in the United States has the right to oppose the use of an infringing mark by proving that the person using the mark knew of the existence and continuous use of the mark in any member nation in connection with goods of the same class. *See* Inter–American Convention, ch. II, art. 7, 46 Stat. at 2918.

Under Chapter III, "[t]rade names or commercial names of persons entitled to the benefits of this Convention shall be protected in all contracting States." Inter–American Convention, ch. III, art. 14, 46 Stat. at 2926.

#### 2. Plaintiffs' Proposed Third Claim

■ In order to prevail on a claim of trademark infringement in violation of the Lanham Act, a plaintiff must show (1) that it has a valid mark that is entitled to protection under the Act, and (2) that use of the defendant's mark infringes plaintiff's mark. *Estee Lauder, Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508 (2d Cir.1997). *See generally Sports Authority, Inc. v. Prime Hospitality Corp.*, 89

F.3d·955, 960 (2d Cir.1996); *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072 (2d Cir.1993). As discussed above, Plaintiffs fail to meet the threshold requirement of possessing a valid mark. As a result, Plaintiffs cannot seek protection of that mark under the Lanham Act.

■ Plaintiffs are also unable to advance a claim based on Article 7 of the Inter–American Convention.[11] Under Article 7, a party opposing ·another's use of the mark

> may claim for [it]self the preferential right to use such mark in the country where the opposition is made ... *upon compliance with the requirements established by the domestic legislation in such country and by this Convention.*

Inter–American Convention, ch. II, art. 7, 46 Stat. at 2918. (emphasis added). Here, Plaintiffs have not complied with United States law because they have no rights to the mark. As discussed above, Plaintiffs have no rights to the registered mark. Thus, Plaintiffs have no standing to assert a preferential right to use the mark. Plaintiffs, therefore, cannot advance a claim under Article 7.

### 3. Plaintiffs' Proposed Fourth Claim

■ Plaintiffs seek to protect the "Havana Club" trade name under §§ 44(g) and (h) of the Lanham Act as well as Chapter III of the Inter–American Convention. A trade name as defined by federal law cannot be registered under the Lanham Act. *See Application of Walker Process Equipment, Inc.*, 43 C.C.P.A. 913, 915, 233 F.2d 329, 331 (1956); 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 9.13 (3d ed.1997). The rationale behind this rule is that "a trade name is usually adopted for the purpose of identifying the company and distinguishing it from other producers, rather than for the trademark purpose of identifying goods, and distinguishing them from those produced by other producers." *Id.* Use of the trade name is the basis for obtaining exclusionary rights; under the Lanham Act, a trade name is "used by a person to identify his or her business or vocation." 15 U.S.C. § 1127. As with trademarks, the test

of infringement of trade names is "likelihood of confusion." *See Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 579–80 (2d Cir.1991).

■ As noted above, Plaintiffs acknowledge their inability to sell rum in the United States due to the CACR. However, Plaintiffs argue that they have used their trade name in a manner which identifies their business. *See* First Amend. Compl. ¶ 36. Plaintiffs' use of the trade name abroad, *id.* ¶ 25; the importation of Havana Club rum into the United States as accompanying baggage, *id.* at ¶ 28; and the "repeated, extensive, continuous and widespread mention and discussion" of Havana Club rum in United States newspapers and periodicals have all helped to establish in the public mind that Plaintiffs are the producers of Havana Club rum, *id.* at ¶ 38. Even if Plaintiffs' established use of their trade name were not sufficient to identify them as producers of the rum, the CACR is a temporary suspension of Plaintiffs' ability to use the trade name. *See Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*, 457 F.Supp. 1090, 1101 (S.D.N.Y.1978) (plaintiff found not to have abandoned mark when prevented from exporting cigars into the United States due to intervention by Cuban government). Without the obstacles of the CACR, Plaintiffs would, as they claim, be able to establish a greater presence in the United States as producers of Havana Club rum. Plaintiffs therefore allege that the use of the Havana Club mark by Defendants will lead to consumer confusion and error. Plaintiffs are permitted to amend their complaint to assert this claim.

■ Plaintiffs also seek to assert a claim under Chapter III of the Inter–American Convention. Chapter III plainly allows nationals of signatory nations to oppose another's use of an infringing mark. Article 18 of Chapter III states that any owner of a trade name in a signatory nation "may, in accordance with the law and procedure of the country where the proceeding is brought, apply for and obtain an injunction against the use of any commercial name" by proving (a)

---

**11.** It is highly unlikely that Plaintiffs can assert a claim under the Inter–American Convention without satisfying the requirements of the Lanham Act.

the infringing mark or commercial name is identical with or deceptively similar to Plaintiffs' commercial name and (b) that prior to Defendants' use, Plaintiffs adopted and used the name. *See* Inter–American Convention, ch. III, art. 18. Plaintiffs allege Defendants' infringing mark is identical with or deceptively similar to theirs. Plaintiffs also satisfy the use requirement of Chapter III through the use of their trade name in Cuba. Accordingly, Plaintiffs may bring a claim to protect their trade name under the Inter–American Convention.

### III. PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS

Plaintiffs move to dismiss the following counterclaims: (1) a declaratory judgment that Defendants have "the prior, superior and exclusive right" to use the mark on the basis of the alleged rights of a former Cuban corporation, Jose Arechabala, S.A.; (2) the cancellation of the registration on the belief that Plaintiffs have used the mark to misrepresent the source of the goods in violation of the Lanham Act, 15 U.S.C. § 1064(3); and (3) three separate claims of fraud arising from Cubaexport's original application to register the mark and filing of a declaration of continuing use pursuant to § 8 of the Lanham Act, 15 U.S.C. § 1058.

It is too early to decide these motions. As discussed above, Cubaexport should now be a participant in this action. Cubaexport may seek to raise its own defenses to Defendants' counterclaims and should be given the opportunity to do so. In light of the decision to restore Cubaexport's rights to the mark, Defendants may want to reconsider their counterclaims. Because Plaintiffs' motion is premature, that motion is denied without prejudice to renew at a later date.

### IV. CONCLUSION

For the reasons set forth above, Plaintiffs have obtained no rights to the Havana Club trademark via the CACR or the Inter–American Convention. As a result of the invalid transfer, however, Cubaexport's rights to the mark are restored and Defendants' motion for cancellation of Registration No. 1,031,651 is denied. Plaintiffs' motion to amend their complaint is granted, in part, and denied, in part. Plaintiffs' motion to dismiss certain of Defendants' counterclaims is denied without prejudice. A status conference is scheduled for August 14, 1997 at 10 a.m.

SO ORDERED.