Chris **PARADISSIOTIS,**
**Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 01–5094.**

United States Court of Appeals,
Federal Circuit.

DECIDED: Sept. 13, 2002.

See also 171 F.3d 983.

Edwin Armistead Easterby, Looper, Reed & McGraw, a Professional Corporation, of Houston, TX, argued for plaintiff-appellant.

Jeffrey A. Belkin, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; and Mark A. Melnick, Assistant Director. Of counsel on the brief were Barbara C. Hammerle and Stevenson O. Munro, Office of the General Counsel, Department of the Treasury, of Washington, DC.

Before CLEVENGER, RADER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

This case presents a narrow question under the Takings Clause of the Fifth Amendment: whether the Treasury Department's act of freezing the assets of the appellant, a person determined to be an agent of the government of Libya, constituted a compensable taking of the value of certain stock options owned by the appellant when the stock options expired while the appellant's assets were frozen. The appellant does not challenge the act of freezing his assets, but contends that the Treasury Department should have granted him a license to exercise the stock options before they expired and then kept the proceeds of that transaction in an interest-bearing account. The Court of Federal Claims rejected that argument, as do we. The act of freezing the plaintiff's assets in this country, including the stock options, was not a compensable taking in the first instance, and the Treasury Department's refusal to lift the freeze to allow the plaintiff to exercise the stock options did not convert the act of freezing the plaintiff's assets into a taking for which the government is required to pay just compensation.

## I

### A

In January of 1986, in response to Libyan support for international terrorism, President Reagan issued two executive orders banning commerce with Libya and freezing all U.S. assets of the Libyan government and its agents. *See* Exec. Order No. 12,543, 51 Fed.Reg. 875 (Jan. 7, 1986); Exec. Order No. 12,544, 51 Fed.Reg. 1235 (Jan. 8, 1986). Pursuant to those execu-

tive orders, the Treasury Department's Office of Foreign Assets Control promulgated the Libyan Sanctions Regulations, which ordered the freezing or blocking of all U.S. assets owned or controlled by the government of Libya and prohibited all U.S. persons and corporations from doing business with the government of Libya. The regulations also prohibit the acquisition, transfer, or disposition of any security "registered or inscribed in the name of the Government of Libya [as defined]," except pursuant to a license issued by the Office of Foreign Assets Control. 31 C.F.R. § 550.209. The regulations cover stocks, bonds, letters of credit, or "contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future or contingent." 31 C.F.R. § 550.314.

The Libyan Sanctions Regulations define the government of Libya broadly, to include "[a]ny partnership, association, corporation, or other organization owned or controlled directly or indirectly by" the Libyan government or "[a]ny person to the extent that such person is, or has been ... acting or purporting to act directly or indirectly on behalf of any of the foregoing...." 31 C.F.R. § 550.304. Any person falling within the scope of that section is referred to as a Specially Designated National.

B

Appellant Chris Paradissiotis is a citizen of Cyprus. For many years he worked in various capacities for Coastal Corporation ("Coastal"), a Delaware corporation, or its subsidiaries. In 1985, Mr. Paradissiotis received option contracts to buy 2,250 shares of Coastal stock at $20.91 per share. The following year, he became a director of Holborn Oil Trading, Ltd. ("HOTL"), a Bermuda corporation owned

by Coastal. HOTL runs an oil refinery in Germany on behalf of the Libyan government. HOTL also owns approximately one-third of the stock of Holborn Investment Company, Ltd. ("HICL"), a Cypriot corporation that operates and maintains the German refinery. As of December 1990, the majority owner of HICL was a corporation controlled by the Libyan government through a holding company. HOTL installed Mr. Paradissiotis as a director on the board of HICL.

In 1991, based on Mr. Paradissiotis's connection to HICL and other Libyan-related entities, the Office of Foreign Assets Control listed him as a Specially Designated National pursuant to 31 C.F.R. § 550.304(c). The legal effect of that designation was to treat Mr. Paradissiotis as an agent of the government of Libya and to require that his assets within the United States be frozen. Those assets included his options to buy Coastal stock.

Between January 1993 and December 1996, Mr. Paradissiotis applied to the Office of Foreign Assets Control for licenses to sell or exercise his stock options, which were set to expire on March 19, 1997. When his applications were denied, he brought suit in the United States District Court for the Southern District of Texas challenging the denials. He argued that the Libyan Sanctions Regulations were invalid, that he was improperly listed as a Specially Designated National, and that the act of freezing his stock options violated his constitutional rights. The district court granted summary judgment for the government and ruled, inter alia, that Mr. Paradissiotis could not assert a viable takings claim. Two days after the district court's ruling, the Coastal stock options expired.

The Fifth Circuit affirmed the district court's judgment except with regard to the Fifth Amendment takings claim. *Paradis-*

siotis v. Rubin, 171 F.3d 983 (5th Cir. 1999). The court agreed with the district court that Mr. Paradissiotis was validly labeled as a Special Designated National and that the Treasury Department had acted lawfully in applying the Libyan Sanctions Regulations to prohibit him from exercising his stock options. With respect to the takings claim, the court held that the Court of Federal Claims had exclusive jurisdiction over that issue, and the court therefore vacated that aspect of the district court's judgment.

Mr. Paradissiotis then filed suit in the Court of Federal Claims alleging that the freezing of his assets and the consequent destruction of the value of his stock options constituted a taking of his personal property for public use, in violation of the Takings Clause of the Fifth Amendment. Following a thorough analysis of the applicable law, the Court of Federal Claims dismissed Mr. Paradissiotis's action.

## II

As framed on appeal, Mr. Paradissiotis's claim is very narrow. The Fifth Circuit litigation established that Mr. Paradissiotis was validly denominated a Specially Designated National and that the refusal to permit him to exercise his stock options was consistent with the Libyan Sanctions Regulations and the Executive Orders on which they were based. It is not now open to him to challenge those rulings. Moreover, Mr. Paradissiotis concedes that the act of blocking his assets did not give rise to a valid takings claim. Instead, he argues that although the freezing of his assets was lawful, the Office of Foreign Assets Control should have permitted him to exercise his stock options and then retained the proceeds of that transaction in a blocked, interest-bearing account. The failure to follow that course, he contends, constituted a compensable taking.

The general principles applicable here are well settled. On several occasions, this court has addressed Fifth Amendment takings claims raised by persons or entities that have been adversely affected by actions taken for national security reasons to freeze the assets of, or prohibit transactions by, foreign entities, and on each occasion we have held that the actions have not violated the Takings Clause. With specific reference to the Libyan Sanctions Regulations, we have held that those regulations substantially advance the national security of the United States and that the frustration of contract rights resulting from the application of those regulations does not constitute a Fifth Amendment taking. Chang v. United States, 859 F.2d 893, 896–97 (Fed.Cir.1988); see also 767 Third Ave. Assocs. v. United States, 48 F.3d 1575, 1581 (Fed.Cir.1995).

The principle underlying those decisions was articulated by the Supreme Court in the Legal Tender Cases (Knox v. Lee), 79 U.S. (12 Wall.) 457, 551, 20 L.Ed. 287 (1870), where the Court explained:

A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared? ... [W]as it ever imagined this was taking private property without compensation or without due process of law?

While takings law has changed significantly since those words were written, the language used by the Supreme Court has often been quoted, and the principle remains sound. See Omnia Commercial Co. v. United States, 261 U.S. 502, 509–10, 43 S.Ct. 437, 67 L.Ed. 773 (1923); B–West

*Imports, Inc. v. United States,* 75 F.3d 633, 638 (Fed.Cir.1996); *Chang,* 859 F.2d at 897; *Galloway Farms, Inc. v. United States,* 834 F.2d 998, 1002 (Fed.Cir.1987). Thus, valid regulatory measures taken to serve substantial national security interests may adversely affect individual contract-based interests and expectations, but those effects have not been recognized as compensable takings for Fifth Amendment purposes. As applied to economic sanctions such as orders blocking transactions and freezing assets, that principle disposes of any suggestion that the United States could freeze Libyan assets in this country only if it were prepared to pay the cost of any losses resulting from the freeze. Economic sanctions would hardly be sanctions if the foreign targets of the sanctions could simply stand in line to be compensated for the losses those sanctions caused them.

■ Mr. Paradissiotis does not take issue with that general principle, but he contends that it is not applicable to this case because the refusal to permit him to exercise his stock options did not serve the purposes underlying the Libyan Sanctions Regulations and the enabling statute, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–06 (1994). He contends that the purpose of IEEPA and the Libyan Sanctions Regulations is to preserve foreign assets subject to United States jurisdiction so that they will be available for use as bargaining chips in negotiating the resolution of a declared national emergency and to facilitate the disposition of claims of United States citizens with respect to those assets. Allowing the value of his stock options to be destroyed by blocking their exercise until the options expired did not serve those purposes, he argues, and therefore cannot be justified by the national security interests that are promoted by IEEPA,

the 1986 Executive Orders, and the Libyan Sanctions Regulations.

While the interests cited by Mr. Paradissiotis are among those served by freezing assets and blocking transactions involving hostile foreign powers, the backgrounds of IEEPA and its predecessor, the Trading with the Enemy Act, 50 U.S.C.App. §§ 1–44, make clear that those actions serve other interests as well. Those interests include "depriv[ing] enemies, actual or potential, of the opportunity to secure advantages to themselves or to perpetuate wrongs against the United States or its citizens through the use of assets that happened to be in this country," *Propper v. Clark,* 337 U.S. 472, 481, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949), and denying hostile foreign governments and nationals access to funds "which might be used to promote activities inimical to the interests of the United States," *Miranda v. Secretary of the Treasury,* 766 F.2d 1, 5 (1st Cir.1985). Moreover, one of the purposes of economic sanctions is to put economic pressure on the target government by preventing its representatives from engaging in profitable economic activity in this country and elsewhere. *See Milena Ship Mgmt. Co. v. Newcomb,* 995 F.2d 620, 625 (5th Cir.1993) (observing that "the purpose of economic sanctions ... is to exert economic pressure on the offending government, not to mitigate it"). It would be inconsistent with that purpose to allow a designated Libyan agent to engage in a profitable securities transaction involving a United States asset, just as it would be inconsistent with the sanctions' purpose to allow a Libyan oil company to do business in this country. Merely freezing the proceeds of either form of economic activity would not serve the purposes of the economic sanctions, as it would permit Libyan entities to engage in profitable transactions with the expectation of ultimately recovering the proceeds of those transactions in full. We therefore

reject Mr. Paradissiotis's argument that the government's refusal to permit him to exercise his stock options was contrary to the purposes of the applicable statutory and regulatory provisions and thus constituted a Fifth Amendment taking.

■ We also reject Mr. Paradissiotis's argument that he suffered a compensable taking because at the time he obtained the Coastal stock options he had a reasonable expectation that he would be able to exercise those options and the government's refusal to permit him to do so upset those expectations. In making that argument, Mr. Paradissiotis invokes the line of regulatory takings cases that have looked to whether the claimant had reasonable investment-backed expectations that were upset as a result of the regulatory action in question. *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1985); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

Contrary to cases in which, for example, a claimant purchased property but subsequently enacted regulatory measures destroyed the property's value, *see Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), in this case Mr. Paradissiotis's stock options were in no jeopardy until 1990, when he took the step that ultimately resulted in his loss—serving as a director of a Libyan-controlled corporation. At that time, the consequences of his conduct were entirely foreseeable. The Libyan Sanctions Regulations had been in effect for four years, it was clear that his position made him subject to those regulations, and it was clear that exercising his stock options would be a prohibited transaction under the regulations. The pertinent date for considering

Mr. Paradissiotis's expectations was 1990, when he took the step that subjected him to regulations that otherwise would have had no effect on him. As of that date, he had clear notice of what the consequences of his actions would be. *See Meriden Trust & Safe Deposit Co. v. Fed. Deposit Ins. Corp.*, 62 F.3d 449, 455 (2d Cir.1995) (because the plaintiff bank chose to maintain its insured status, "voluntarily subjecting itself to a known obligation, .... no unconstitutional taking occurred"). Mr. Paradissiotis took the risk—a big risk, in light of the high visibility of the Libyan sanctions regime—that his involvement with a Libyan-controlled corporation would result in loss of access to his United States assets. The fact that his risk-taking turned out badly for him does not render it a taking in violation of the Fifth Amendment.

*AFFIRMED.*