In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-2536

GLOBAL RELIEF FOUNDATION, INC.,

*Plaintiff-Appellant,*

*v.*

PAUL H. O'NEILL, Secretary of the Treasury, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 C 674—**Wayne R. Andersen**, *Judge.*

ARGUED OCTOBER 29, 2002—DECIDED DECEMBER 31, 2002

Before CUDAHY, COFFEY, and EASTERBROOK, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Following the terrorist attack of September 11, 2001, the President issued an executive order declaring a national emergency and authorizing the Secretary of the Treasury to freeze the assets of groups that "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism" to the extent that statutes permit freezes. Executive Order 13224 §1(d)(i), 66 Fed. Reg. 49079 (Sept. 23, 2001). Authority for this order lies in the International Emergency

Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-07, which after Executive Order 13224 was amended by the USA PATRIOT Act, Pub. L. 107-56, Title I, §106, 115 Stat. 272 (Oct. 26, 2001). On December 14, 2001, the Secretary used the delegated authority to block all assets of Global Relief Foundation, Inc., an Illinois charitable corporation that conducts operations in approximately 25 foreign entities, including Afghanistan, Albania, Bosnia, Kosovo, Iraq, Lebanon, Pakistan, Palestine (West Bank and Gaza), Russia (Chechnya and Ingushetia), Somalia, and Syria. The provision underlying this action is §1702(a)(1)(B), which provides that the President may

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

Global Relief Foundation (which goes by the acronym GRF) denies that any "foreign . . . national" has an "interest" in its assets, and it asked the district court to enjoin the blocking order for this reason and several others said to be rooted in the Constitution. The district court denied this request, see 207 F. Supp. 2d 779 (N.D. Ill. 2002), and GRF has appealed.

When the district court acted, the blocking order was an interim step pending investigation. The freeze on December 14 was accompanied by a search of GRF's headquarters, and the Treasury Department planned to use evidence obtained from the search, plus submissions it invited

from GRF, to decide whether to extend the freeze. One element of relief that GRF requested was an injunction against the extension, which would be accomplished by naming GRF a "Specially Designated Global Terrorist" under Executive Order 13224. On October 18, 2002, shortly before oral argument, the Office of Foreign Assets Control listed GRF as a Specially Designated Global Terrorist. See <http://www.treas.gov/offices/enforcement/ofac/ actions/20021018.html>. Designation does not change the status of GRF's assets and records, which remain in Treasury's control. But it does affect the scope of arguments available on appeal. Because the designation is a *fait accompli*, a court cannot enjoin its making—though a court might direct the Office of Foreign Assets Control to lift it. To the extent that GRF was attacking the factual support for the interim order, time has passed that issue by; the right question now is whether the designation of October 18 is supported by adequate information, and that question cannot be resolved until the district court has assembled a new record. What is more, some of GRF's principal legal theories drop out of the case. It contended, for example, that Executive Order 13224, which was issued before enactment of the USA PATRIOT Act, could not have delegated to the Secretary of the Treasury those powers added to the IEEPA by the new law. The change that potentially affected this case was the addition to §1702(a)(1)(B) of language authorizing asset freezes pending investigation. Now that the investigative stage is over, however, the amendment to the IEEPA does not matter to the freeze, and it is correspondingly inappropriate for us to decide whether Executive Order 13224 delegates powers enacted after September 23, 2001.

Appellees make a broader argument: that the appeal is moot and should be dismissed. Obviously the *suit* is live. Treasury has blocked GRF's accounts and thus effectively shut down its operations across the globe. A federal

court could order Treasury to end the freeze. When relief is possible, a lawsuit is not moot. See *Spencer v. Kemna*, 523 U.S. 1 (1998); *Hall v. Beals*, 396 U.S. 45 (1969). One application of this principle is that suits seeking money damages, as GRF does, cannot become moot unless the defendant satisfies the plaintiff's demand. See *Powell v. McCormack*, 395 U.S. 486, 498-500 (1969). Injunctive relief directing Treasury to lift all restrictions on GRF's assets and operations also remains an option. Even voluntary cessation by the defendants would not moot the case, while any possibility remained that they would again freeze GRF's assets. See *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Services*, 532 U.S. 598, 608 (2001); *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189 (2000). Still, appellees contend, the *appeal* is moot in the sense that word often takes when an appeal from the grant of preliminary injunctive relief is overtaken by the grant of permanent injunctive relief. Whether the record adequately supported relief pending trial is of no moment once the trial has been held and permanent relief entered. All that then matters is whether the record supports permanent relief. See, e.g., *Continental Training Services, Inc. v. Cavazos*, 893 F.2d 877, 880 (7th Cir. 1990). Just so, appellees insist, now that the freeze pending investigation has been replaced by a final order naming GRF as a Specially Designated Global Terrorist.

This would be a good analogy if *all* that GRF wanted was review of the freeze in light of the information that Treasury possessed on December 14, 2001, or if the only point of the appeal had been to obtain an order preventing the Treasury Department from blocking the assets until it had reached a final decision. Those issues are behind us, and no resolution one way or the other could do GRF any good today. The premise of appellees' suggestion of mootness is that GRF's current requests are limited

to its status pending final administrative resolution; appellees concede that the appeal would not be moot if GRF sought relief against any permanent blocking order. Suggestion of Mootness at 6-8. Yet GRF's ambition is not so limited. It contends, among other things, that the IEEPA *never* applies to the assets of any corporation that holds its charter from one of the United States. This argument, if successful, would knock out any freeze, preliminary or permanent, without regard to the strength of the evidence. If GRF is right on this score, then it is entitled to relief immediately. Dismissing this appeal, and directing GRF to start from scratch in the district court with a challenge to the designation of October 18, then would compound the injury by extending the length of an illegal administrative action. It is because of possibilities such as this that courts say that entry of a permanent injunction (or, here, a permanent administrative order) "usually" calls for dismissal of the appeal from preliminary relief. See *Burgess v. Ryan*, 996 F.2d 180, 184 (7th Cir. 1993). "Usually" is not always; one appropriate exception is for a legal argument that would annul *any* adverse decision, temporary or permanent.

Now the scope of its ambition would not be enough if GRF had not advanced and preserved these arguments, but it has done what is required. Soon after receiving formal notice from Treasury that proceedings were under way that could end in its being named a Specially Designated Global Terrorist, GRF asked the district court to stave off that action. This request, in a document filed on June 5, 2002, and styled "Rejoinder to Defendants' Notice," asks the court to block the designation and advances arguments that have been reiterated in the appellate briefs. Although the district judge did not expressly deal with this aspect of GRF's position, he did address many of the underlying legal arguments (such as the contention that the IEEPA does not apply to U.S. corporations). It is unnec-

essary to recite the details of GRF's arguments in the district court and this court. Defendants' argument that GRF has forfeited contentions that would carry over to the current circumstances is unsound. So on the defendants' own approach to mootness, at least some of the issues presented on appeal are live, and GRF is entitled to a prompt decision on them.

Let us turn, then, to GRF's contention that the IEEPA does not apply to corporations that hold charters issued within the United States. The argument is straightforward: a U.S. corporation is a U.S. citizen; the corporation owns all of its property (including its bank accounts); this property therefore cannot be "property in which any foreign country or a national thereof has any interest" for the purpose of §1702(a)(1)(B). The district court observed that two of the three members of GRF's board are foreign nationals, but this does not alter the fact that GRF is itself a citizen of the United States. Neither membership on the board nor ownership of stock affects the citizenship of the firm, which as a matter of corporate law has an existence separate from that of the directors and investors. Cases such as *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176 (1982), illustrate the application of this principle to federal statutes. Treaties that the United States has negotiated with many foreign nations allow citizens (including corporations) of those nations certain privileges within the United States. *Avagliano* holds that a U.S. subsidiary of a foreign corporation is a U.S. citizen, not a foreign citizen, for the purpose of these treaties, which meant that the subsidiary must comply fully with U.S. law even though 100% of its stock may be held by foreign nationals. Some statutes prescribe a different rule. The Foreign Sovereign Immunities Act, for example, treats a corporation as having the sovereign attributes of a government that owns the majority of its stock. 28 U.S.C. §1603(b)(2). Cf. *Patrickson v. Dole Food*

*Co.*, 251 F.3d 795 (9th Cir. 2001), cert. granted, 122 S. Ct. 2657 (2002) (posing the question whether indirect ownership, through a holding company structure, receives the same treatment). But under the Foreign Sovereign Immunities Act a corporation chartered within the United States always is treated as a private U.S. citizen, even if a foreign nation owns all of its stock. 28 U.S.C. §1603(b)(3). Given the holding of *Avagliano* and the norm reflected in §1603(b)(3), does it not follow that the property of any corporation chartered within the United States is domestic U.S. property?

No, it does not follow, and for a simple reason. GRF reads the word "interest" in §1702(a)(1)(B) as referring to a *legal* interest, in the way that a trustee is legal owner of the corpus even if someone else enjoys the beneficial interest. See *Navarro Savings Association v. Lee*, 446 U.S. 458 (1980). The legal interest in GRF's property lies in the United States, but we need to know whether §1702(a)(1)(B) refers to legal as opposed to beneficial interests. The function of the IEEPA strongly suggests that beneficial rather than legal interests matter. The statute is designed to give the President means to control assets that could be used by enemy aliens. When an enemy holds the *beneficial* interest in property, that is a real risk even if a U.S. citizen is the legal owner. Consider for a moment what would happen if Osama bin Laden put all of his assets into a trust, under Illinois law, administered by a national bank. If the trust instrument directed the trustee to make the funds available for purchases of weapons to be used by al Qaeda, then foreign enemies of the United States would have an "interest" in these funds even though legal ownership would be vested in the bank. The situation is the same if al Qaeda incorporated a subsidiary in Delaware and transferred all of its funds to that corporation—something it could do without any al Qaeda operative setting foot in the

United States. What sense could it make to treat al Qaeda's funds as open to seizure if administered by a German bank but not if administered by a Delaware corporation under terrorist control? Nothing in the text of the IEEPA suggests that the United States' ability to respond to an external threat can be defeated so easily. Thus the focus must be on how assets could be controlled and used, not on bare legal ownership. GRF conducts its operations outside the United States; the funds are applied for the benefit of non-citizens and thus are covered by §1702(a)(1)(B).

This understanding is consistent with the portion of *Dames & Moore v. Regan*, 453 U.S. 654, 675 (1981), on which GRF relies. The Court observed that "claims of American citizens against Iran are not in themselves transactions involving Iranian property or efforts to exercise any rights with respect to such property." GRF reads this as excluding any claims or other property owned by citizens of the United States. We read it, to the contrary, as focusing on the nature of the property rather than the identity of its owner. Claims *against* Iran not only were owned by U.S. citizens but also were designed to generate funds that would be used beneficially within the United States. Claims owned nominally by U.S. citizens but effectively controlled by Iran, or designed to raise funds for the operation of the Iranian government, would have been treated differently, we are confident. See also *Centrifugal Casting Machine Co. v. American Bank & Trust Co.*, 966 F.2d 1348, 1353-54 (10th Cir. 1992) (looking to the nature of the interest, rather than the citizenship of its legal owner, to determine whether it is within scope of IEEPA). So the fact that GRF as a U.S. corporation owns all of its assets does not mean that the assets are free of any foreign national's interest. Cf. *Regan v. Wald*, 468 U.S. 222 (1984).

A foreign beneficial interest does not automatically make the funds subject to freeze. We have nothing to say here

about whether GRF supports terrorism (as Treasury has concluded) or instead provides humanitarian relief (as it describes itself). That question is open to review in the district court, on the record compiled by the agency before it named GRF as a Specially Designated Global Terrorist. What we hold is that the phrase "property in which any foreign country or a national thereof has any interest" in §1702(a)(1)(B) does not offer GRF a silver bullet that will terminate the freeze without regard to the nature of its activities.

None of GRF's constitutional arguments has that effect either. There is no separation-of-powers problem, as *Dames & Moore* shows. The Steel Seizure Case, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), dealt with a seizure of private assets under a President's inherent powers, which the Court deemed insufficient; Executive Order 13224, by contrast, delegates to the Secretary only those powers provided by statute.

Administration of the IEEPA is not rendered unconstitutional because that statute authorizes the use of classified evidence that may be considered *ex parte* by the district court. 50 U.S.C. §1702(c). *Ex parte* consideration is common in criminal cases where, say, the identity of informants otherwise might be revealed, see *Roviaro v. United States*, 353 U.S. 53 (1957), and in litigation under the Freedom of Information Act—where public disclosure would divulge the very information that the case is about and thus make it impossible for the government to maintain confidentiality even when the FOIA does not create a right of public access. See *EPA v. Mink*, 410 U.S. 73 (1973). A part of the Antiterrorism and Effective Death Penalty Act of 1996 parallel to §1702(c) has been sustained against constitutional challenge in two decisions with which we agree. See *Iran Council of Resistance v. Department of State*, 251 F.3d 192, 196 (D.C. Cir. 2001); *People's Mojahedin Organization v. Department of State*,

182 F.3d 17, 19 (D.C. Cir. 1999). See also, e.g., *United States v. Ott*, 827 F.2d 473, 476 (9th Cir. 1987), and *United States v. Belfield*, 692 F.2d 141, 147 (D.C. Cir. 1982), which hold that use and *ex parte* judicial review of classified information under the Foreign Sovereign Immunities Act are constitutionally proper. The Constitution would indeed be a suicide pact, *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963), if the only way to curtail enemies' access to assets were to reveal information that might cost lives.

Nor does the Constitution entitle GRF to notice and a pre-seizure hearing, an opportunity that would allow any enemy to spirit assets out of the United States. Although pre-seizure hearing is the constitutional norm, postpone-ment is acceptable in emergencies. See, e.g., *Gilbert v. Homar*, 520 U.S. 924, 930 (1997); *FDIC v. Mallen*, 486 U.S. 230, 240 (1988). Risks of error rise when hearings are deferred, but these risks must be balanced against the potential for loss of life if assets should be put to violent use. Opportunity to obtain recompense under the Tucker Act, 28 U.S.C. §1491(a), if the blocking turns out to be invalid, provides the private party with the very remedy that the Constitution names: just compensation. If the freeze is sustained on the merits, however, GRF does not have any grievance, any more than a cocaine ring has a right to recover the value of the illegal drugs or a thief a right to be paid the value of confiscated burglar's tools. See *Paradissiotis v. United States*, 304 F.3d 1271 (Fed. Cir. 2002). GRF's takings claim not only is premature—it must await decision on the validity of the Global Terrorist designation—but also is in the wrong court. It belongs to the Court of Federal Claims under the Tucker Act.

Other constitutional theories—such as GRF's contention that application of the IEEPA is an ex post facto law—are defective for too many reasons to count. For example, only criminal statutes are deemed ex post facto laws, and the

IEEPA does not define a crime. Moreover, the IEEPA predates GRF's activities, and at all events aid to the enemies of the United States has been unlawful since the Nation's founding. Application of the IEEPA is not a bill of attainder; implementation of the statute is in the hands of the Executive and Judicial Branches, while a bill of attainder is a decision of guilt made by the Legislative Branch. See *United States v. Lovett*, 328 U.S. 303, 315 (1946). It is unnecessary to recite and reject the rest of this lot individually.

Because we have dealt exclusively with legal contentions, our resolution of them is conclusive and not subject to reexamination in the district court when deciding whether GRF is entitled to a permanent injunction. But we have avoided any inquiry into the facts and do not attempt to anticipate the ultimate resolution of GRF's claim. The central question now becomes whether the evidence supports the agency's belief that GRF uses its assets to support terrorism. That question should be addressed and resolved expeditiously in the district court. The judgment denying GRF's request for an injunction that would compel the release of its assets while that issue remains open is affirmed.

CUDAHY, *Circuit Judge*, concurring: I am in agreement with the majority both with respect to mootness and to the merits, but I write separately primarily to suggest the significance of the present determinations for future phases of the case.

On the issue of mootness, a detailed study of the arguments offered by GRF would lend support to the conclusion reached by the majority. GRF did seek at various

points to litigate the question of enjoining the government from blocking GRF's assets through a designation of GRF as a Specially Designated Global Terrorist.

On the merits, the concept of "interest" as it relates to property useful to aliens for terrorist purposes may in some cases be tenuous and require careful attention in application, but is nonetheless valid in light of crucial national security concerns. GRF's constitutional objections are of varying degrees of merit, but its procedural complaints seem of greatest weight, even though not weighty enough to support preliminary relief. These procedural objections may not have been fully formulated in the context of GRF's designation as an SDGT.

On the question of what is yet to be done, we have left factual matters entirely open, as they pertain both to permanent relief and to any preliminary relief that GRF might seek in the future. *See Adams v. City of Chicago*, 135 F.3d 1150, 1153 (7th Cir. 1998) (noting that denial of a preliminary injunction does not doom subsequent motions for temporary relief based on facts unavailable at the time of the first motion). The issues decided at this preliminary level appear entirely legal in nature and not subject to reexamination in any subsequent attempts at preliminary relief based on future factual developments. It is conceivable, of course, that GRF might be able to challenge this conclusion.

A true Copy:

        Teste:

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*